## A. L. RODGERS v. THE STATE.

*No. 3670.    Decided December 5.*

1. **Rape of Child—Charge of Court—Force—Evidence.**—Under article 528, Penal Code, which makes the carnal knowledge of a female under 10 years of age *per se* rape, with or without consent, and with or without the use of force, threats, or fraud, the question of force or assault does not enter into the crime as one of its elements, and in such case the court is not required in its charge to the jury to explain the character and degree of force essential to the crime of rape as applicable to and when committed upon a female over 10 years of age.

2. **Charge of Court — Penetration.** — Where the charge of the court instructed the jury that the fact of penetration must be established beyond a reasonable doubt, and explained what penetration meant, and further added, "It is not necessary that the act of copulation should have been complete, but penetration only, as above explained, need be proved, though such penetration need not have been to any particular depth," *held*, that the charge was in accordance with a proper construction of article 532 of the Penal Code. Penetration, whether with or without injection or emission, is sufficient.

3. **Practice — Treatment of Prosecutrix of Tender Years.** — On a trial for rape of a child of 10 years, it was not error for the court, while said child was being examined as a witness, to permit her aunt to sit by her side during such examination, the aunt having been warned not to speak to or prompt the prosecutrix, and which warning was in no manner violated.

4. **Evidence Held Not Too Remote.**—Where on a trial for rape, while defendant was testifying as a witness in his own behalf, and a certain receipt purporting to have been executed by him was shown him, and he denied its execution, and it appeared from other evidence in the case that said receipt was in his handwriting and had been found by a witness some five or six days after the alleged rape, between the cracks of some planks at the place where the rape was shown to have occurred, and defendant objected to said receipt as evidence, because its finding was too remote from the date of the alleged rape, and the court instructed the jury that they could only consider the receipt in determining the credibility of the witness, *held*, no error. *Held* further, that in the opinion of the court, under the circumstances disclosed therewith, that the finding of the receipt and the receipt itself would have been admissible as original evidence against defendant.

APPEAL from the District Court of Dallas. Tried below before Hon. Chas. Fred. Tucker.

Upon an indictment charging him with the rape of a female under the age of 10 years, appellant was tried, convicted, and his punishment assessed at death.

S. T Dexter, for the State, testified: I am a married man, and was married on the 11th day of August, 1880, in Ellis County, Texas. My wife's name was Clara Newby before I married her. I have a daughter named Roda May Dexter. Roda May Dexter was 10 years old on the 27th day of June of this year, 1891. She was born on the 27th day of June, 1881, and on the 20th day of May she lacked from the 20th day of May to the 27th day of June of being 10 years old. About a month and seven days, I believe it is. I know the defendant A. L. Rodgers. That is the man there with the pencil in his mouth [indicating the defendant]. I saw him on the 20th day of May of this year. When I saw him I was returning from the city, and my little girl Roda May was sitting in Phelan's confectionery store, on the corner of Ross Avenue and Orange Street, drinking a milk shake, and the defendant was standing by her. Phelan's store is just opposite O. T. Lyon's lumber yard. When I saw them I said, "Sister, what are you doing here, and who is this with you?" She told me it was Mr. Rodgers, the sewing machine man, and she had come with him to get a milk shake. I patted her on the head and told her all right, but she had better hurry and come on home before it rained. I left them and started on home, and as I got about home it began drizzling rain, and then rained a pretty good shower after I got in the house. About an hour after I got home Roda May came back, and her mother was scolding and reproving her for staying so long, and she seemed to be crying while her mother was scolding her. My wife told her to get the can and go and get some coal oil, and she said (I afterward remembered) that she didn't feel like it. She was still crying when she started off, and was still crying when she came back, and said she wanted to tell her mother something. She went into a room with her mother, and then my wife came out and told me what had occurred. I took my child and examined her, and found her very bloody. Blood was oozing from her privates and was smeared over her stomach and thighs, and was on her little drawers and underclothes. There were prints of finger or thumb nails in three places on her little thighs, one on one thigh and two on the other, on the inside of her thighs. She was examined by physicians that night. We sent immediately for our family physician. He was not in, and we sent then for others, and Dr. Gibbs and Dr. Burton got there and made an examination about 8 o'clock that night, I suppose. It must have been between 5 and 6 o'clock on the evening of the 20th of May, 1891, when I saw her and the defendant at Phelan's. My little girl was in bed about a week; the first four days she could hardly move without assistance, and the balance of the time she could hardly get off of the bed. When she went off that evening she was barefooted, and when she came back she had on shoes and stockings. I know where Lyon's lumber yard is, and also Hoyle Bros.' yard. I made an examination of Hoyle Bros.' lumber yard on the next day

some time before dinner. I went through Lyon's lumber yard from Phelan's. Lyon's yard is on the south side of Ross Avenue, and runs through to Camp Street, and has gateways on each street and passways through each gate. When you get on Camp Street from Lyon's, in order to go to the Bankrupt Store on Elm Street, there is no street or passway until you go down Camp west until you get to Griffin Street. Routh's wagon yard is a little west of Lyon's yard, and on the opposite side of Camp Street. It is on the south side of Camp Street, and runs back to Hoyle Bros.' lumber yard, which is adjoining and south of Routh's wagon yard. Hoyle Bros.' is on the north side of and fronts Patterson Avenue, between Routh's wagon yard and Hoyle Bros.' lumber yard, and dividing them is a fence. Along this fence is a row of stalls on Routh's side, and on Hoyle Bros.' side there is a row of moulding sheds  There is no passway from the wagon yard into the lumber yard, and the only way one can get through is where one or two pickets are broken in the fence, and then you have to stoop down and crawl through a moulding rack where there was very little moulding left. The bottom of this rack is about two feet above the ground, and it is about three feet up to the next rack above, and there are racks of lumber and moulding above and on both sides. I made this examination the next day some time in the forenoon, in company with the men who worked in the yard, or some of them. We found footprints there between the lumber and the fence, and also on the lumber in this rack leading from the hole. There were prints of little bare feet and a man's shod feet. We also saw on the lumber in this rack where the muddy footprints were a little sack of candy. We didn't take away the candy, but left it until the officer (I think it was Deputy Sheriff Simpson) came, and he took possession of it. [The little sack of candy was shown witness.] I think that is the sack of candy we found there. This all occurred in the city and county of Dallas, in the State of Texas. When I saw Rodgers at Phelan's with my little girl on the 20th of May, 1891, he did not look as he does now. The difference is, he did not have on glasses as he has now, and didn't have those chin whiskers, but was shaved alike all over. His beard was a day or two old, and was just about like it is now on the side of his face. He had a mustache as he has now.

Cross-examined: I don't remember whether I was at supper or had just finished when Roda May first came home. I never saw her when she came into the house, and never noticed her walk in. I had no reason to pay any particular attention to her, and never noticed anything peculiar about her walk.. I noticed her crying, but thought it was because her mother was scolding her. She was in the house when I first saw her. She was gone after the oil not over ten minutes, and had probably been back about the house five minutes before her mother came and told me what had occurred, and I examined Roda. Roda

May was born on the 27th day of May, 1881. She is my daughter, and I know when her birthday comes, and have also got a record of births, marriages, and deaths in the family. That is the reason why I know her age. Yes, sir; I looked at the records for the purpose of testifying in this case. The day I saw the defendant with my little girl in Phelan's was the first time I had ever seen him. Yes, sir; I let my little girl stay at the stand with a stranger. What would you have done? I heard my wife speak of the sewing machine man, and that he had been kind to my little girl.

[The Bible with records of family was produced and identified by witness, who stated that he made all the entries therein, and that if his memory served him correct he made them as the events occurred. The record of Roda May Dexter's birth was then introduced in evidence, and is as follows: "Roda May Dexter was born May 27, 1881."]

Mrs. Clara Dexter, for the State, testified: I am the wife of S. T. Dexter, who was just on the stand. I was married to Mr. Dexter, it will be eleven years this coming August. We were married on the 11th day of August, 1880. I am the mother of Roda May Dexter. I have had five children. Roda May was the oldest of them. Two of them are dead. Roda May was born on the 27th day of May, 1881. I was married in Ellis County, Texas, and afterward lived in Tarrant County, Texas, at Mansfield, and from there we came to Dallas and have lived here about —— years. I know the defendant A. L. Rodgers. I have known him something over a month, or a month and a half. I first met him at my home on Collin Street, in the city of Dallas, in the State of Texas. His appearance is different to what it was then. He has on glasses, and at that time he didn't wear them. At that time, and on the 20th of May, 1891, he only had a mustache and didn't have the chin whiskers, as he has now. He then had no beard on his face at all except a mustache, and all the balance of his face was as clean shaved as the sides of his face are now. The defendant first came to my house canvassing for the New Home sewing machine, and wanted to sell me one and to leave it on trial. I consented for it to be left on trial, and he brought one the same evening. The machine was at my house about a week before this occurred on the 20th of May, and he was at my house nearly every day. He came on the next day with Mr. Parrott, who gives instructions about the machine, and was there four or five times afterward, and seemed to take a liking to my little girl Roda. On two of these visits he was there about —— o'clock in the evening, when Roda May was starting to market, and he said that was on his way home, and he would go along with her and get her some candy at the stand down on the corner. These two times he gave her candy and treated her nicely. He came to my house last on the 20th of May of this year, and Roda May didn't have to go to the market that evening, and the defendant said, "Come on, Roda, and

let's go and get a milk shake," and she asked me if she could go. I told her she had better not, as it looked like it was going to rain; but he insisted on her going and took hold of her hand, and they went on, and the last I saw of them until Roda May returned by herself was when they turned the corner on Orange Street, about one-half block from the house. This was a little after 5 o'clock in the evening. After they left it began raining and rained a pretty good shower. It must have been a little after 6 when Roda May came back, and I began scolding her for staying so long, and gave the child a real severe scolding. She seemed to be crying, and she said nothing. I thought she was crying at the scolding, and took no particular notice of it. I afterward noticed something strange about the child, and said, "Roda, what is the matter?" and she told me what had occurred. I took her into a room and examined her, and then called my husband in. I just can't tell what condition the little thing was in. She was smeared with discharged blood from her parts, and her little thighs were bruised with finger prints; her little panties were bloody. She had had them on a couple of days, but they were clean when she left home. [The drawers and underskirt with blood on them were produced and identified by witness as the same worn by the child, and as in the same condition as when taken off the child.] Witness stated further, that when Roda May left on that evening with defendant she was barefooted, and when she returned she had on shoes and stockings. I put the child in bed and sent for our physician, but he couldn't be found, and we sent for others, and Dr. Gibbs and Dr. Burton came and made an examination of her about 8 o'clock that evening.

Cross-examined: My husband and I were married on the 11th day of August, 1880, and Roda May was born on the 27th day of June, 1881. My husband made the entry of Roda's birth. [The Bible containing the family record was shown her by defendant's counsel.] That is my Bible, and I think the entry of Roda's birth was made at the time of the birth of my second child, now dead. No, sir; I was not alarmed at Roda May being gone an hour. She frequently was at Mr. Phelan's store, and I thought the rain had kept her. It rained pretty hard while she was gone. No, sir; I never said anything to the county attorney about sending her for coal oil. I did send her after some coal oil after I had scolded her. She had to go about one hundred yards to the store. She was gone not over ten minutes, and had been back probably five minutes when I discovered what had occurred. After she came back I noticed her still crying, and saw that something was wrong. Mr. Phelan's store is about two blocks from our house. I don't know of my own knowledge what store she went to after the oil. I never bought the machine. The agent came and got it after this occurrence. I had told Mr. Rodgers several times before the 20th of May that I didn't think I could buy it, and that he had better take it, but

he wouldn't do it, and the day before the 20th, when all this occurred, he came by my house in his wagon, and I told him I was going to move and he had better take the machine, as I didn't want to move it. He said I had better take it with me and give it a good trial, and that he would get it some other time. I told him I didn't want it, and he said, "Well, I can't take it now; I have got to go by another lady's to see about a machine." My little girl was in bed about a week, and it was three or four days before she could move herself or sit up in bed at all. Roda had gone to school some. Yes, sir; to the public schools here in the city. She went a short time this past winter. When I examined her I did not find lacerations and abrasures from which blood could come. The blood came from her private parts. The only lacerations or bruises I saw were the nail prints on her thighs. The blood was not coming from them. Her clothes were not muddy. I think she had on a red skirt.

Roda May Dexter, for the State, testified, after being sworn upon application of counsel for defendant, and examined by the court touching her competency to testify: My name is Roda May Dexter. I was 10 years old June 27, 1891. I know the defendant A. L. Rodgers. He is in the court house. [Points to defendant.] His appearance is changed since I saw him on the 20th day of May this year. He has on glasses now. He wore none then. He only had a mustache then, and has chin whiskers now. On the evening of May 20, 1891, the defendant came to our house to see mamma about a sewing machine, and he asked me if I didn't want to go down to Phelan's, on the corner of Ross Avenue and Orange Street, and get a milk shake. I told him yes, and started on down. Twice before this when I was going to market he went along with me and treated me nice and bought me candy at Phelan's, and when we got there on the 20th of May he bought me a glass of milk shake and some candy and licorice. The candy and licorice was in a little bag. The licorice was little sticks and the candy was little squares, and were in the same bag. [The little bag of candy was produced and witness examined it, pointed out the licorice, and identified it as the same bought for her by defendant.] After I had finished the milk shake we went out of Phelan's and I started home, and the defendant asked me to come and go down to Elm Street with him and he would get me cream cakes for my little sister, and I went with him. We started on down Ross Avenue toward Griffin Street, and Mr. Rodgers said, "Let's go through Lyon's lumber yard." I said, "This is the way," going on down the street; and he said, "This is nearer, through the lumber yard;" and I went with him. We passed through Lyon's lumber yard on Camp Street, and it commenced raining. We went on down Camp Street until we came to the wagon yard. We went through there and went to that little hole in the fence between Routh's wagon yard and Hoyle Bros.' lumber yard. Mr. Rodgers said for us to go

through that way to get out of the rain. At the little hole in the fence he told me to get down and crawl through and he would follow me. I crawled through and crawled on the lumber, and Mr. Rodgers crawled after me and pushed me over on the lumber, pulled up my clothes and got on top of me, and nearly killed me. He unbuttoned his pants down here [indicating the privates], pulled out something, and put it in me. He put it in me down here [indicating her private parts]. I felt it in me. It hurt me, and he was on me fifteen or twenty minutes. He got off and buttoned his pants, and then wiped my face, and then wiped me here [indicating her privates] with a piece of white paper. I did not halloo. I buttoned up my panties, and he told me that if I gave him away he would murder me and my mamma both. He told me to come and go down to the Bankrupt Store, on Elm Street, and he would buy me a pair of shoes and stockings. We went on to the Bankrupt Store. I left the bag of candy on the lumber where defendant pushed me down. When we got to the Bankrupt Store he bought me a pair of shoes and stockings, and put them on me and tied the garters, and then went with me down to Osborn's grocery store. He gave me a nickel and told me to go home and not to tell anybody on him. I went on home and got my little sister a banana with the nickel. When I got home mamma sent me after some coal oil, and when I came back I told my mamma. This all occurred in Dallas, Dallas County, Texas, and on the 20th day of May of this year. I was sore, and it hurt me all the time, but I didn't know the blood was on me until I went out. After I came back with the oil, it was then I told my mamma. My papa came by when we were at Mr. Phelan's drinking the milk shake and asked me who it was with me, and I told him it was Mr. Rodgers, the sewing machine man, and he had brought me to give me a milk shake, and he told me to hurry on home before it rained.

Cross-examined: When we were in the back part of the wagon yard and got to Hoyle's lumber yard, the only person I saw was a man watering his horse at a trough. I never saw any men sitting in front of a little house at the entrance to the wagon yard. I never saw anybody in the lumber yard of Hoyle Bros. When I got up and buttoned up my drawers I didn't see any blood. We went on through Hoyle Bros.' lumber yard to Patterson Avenue and down to Griffin Street, and on Griffin to Elm. When Mr. Rodgers left me at Osborn's store he went on up Elm toward the Union Depot, and I went on down Griffin Street home. I didn't tell Mr. Rodgers to "Let's go through Lyon's lumber yard; that I had been through there often, and it is nearer." I started down Ross Avenue to Griffin, and he said for us to go through the lumber yard. The store I went to after the oil was just above Mr. Phelan's. It was just a little further than Mr. Phelan's. Yes, sir; it hurt, but I didn't know anything about the blood until I came back home and went out; then I saw it. I was in bed about a week. Yes,

sir; I could get up on the chamber the last two or three days I was in bed. The first four days I couldn't get up at all.

J. T. McGuire, for the State, testified: I live in the city and county of Dallas. On the evening of the 20th of May, the evening the rape is said to have occurred, a little after 5 o'clock in the evening, I was passing along Ross Avenue near Phelan's store, on the corner of Ross Avenue and Orange Street. I saw a man and a little girl, and heard the man say something to the little girl about going through Lyon's lumber yard, just across Ross Avenue. The little girl replied, "Let's go down the street," and the man said, "No, this is nearer; let's go through this way," starting toward the lumber yard. I think the little girl said the second time, "Let's go down the street," but I am not sure; but she turned back and followed him. She had got past the passage way through Lyon's, and turned back after him. I can't say defendant is the man. I had never seen them before. I never paid any attention to them. I saw the little girl Roda May Dexter here at the court house. I can't say she is the little girl. I never noticed how they were dressed. I heard of the rape the next morning, and remembered this occurrence. I remember the time, because I quit my work on the Gaston building at the Merchants' Exchange at 5 o'clock, and was going home.

Red Routh, a witness for the State, testified: I am engaged in running a wagon yard in the city and county of Dallas, State of Texas. My wagon yard fronts on Camp Street, and is on the south side of Camp Street, and runs back to and joins Hoyle Bros.' lumber yard, which is south of my yard, and runs from the back of my wagon yard to and fronts on Patterson Avenue. It is on the north side of Patterson Avenue. There is no passage way between my wagon yard and Hoyle's lumber yard except a hole in the fence made by two broken pickets, leading to the moulding racks of Hoyle Bros.' lumber yard. A person has to get down and crawl through the hole in the fence and then crawl through the rack, under and over the lumber. The lumber shed runs all along the dividing fence between the lumber yard and my yard. On the evening of the 20th of May, the day the rape is said to have occurred, some time after 5 o'clock, myself and several others were sitting inside of my office near the entrance to my yard, and I saw a man and a little girl pass the office door, which was open. It was raining at the time, and the man was walking fast and the little girl was trotting along to keep up with him. They passed the door going toward the back of my yard. It would be hard for me to say whether that is the man or not. His size and general appearance is the same, but I don't think he had any beard and glasses on. I don't know whether it was Roda May Dexter with him or not. I don't know how the parties were dressed. I just saw them as they passed the door, and paid no particular attention to them. I think the little girl had on

white. She was barefooted and trotting along to keep up with the man.

Cross-examined: I don't know whether the defendant and Roda May Dexter were the parties or not. I had never seen them before. I heard no hallooing or any unusual noise. It is, let me see, about one hundred and sixty feet from where I was to the back of my wagon yard. The Lyon's lumber yard runs through from Ross Avenue to Camp Street. It is on the north side of Camp Street, and is a little above me on the other side of Camp Street. My yard is between Lyon's lumber yard and Hoyle Bros.' lumber yard. There are driveways between the stacks of lumber in Lyon's lumber yard running clear through from Ross Avenue to Camp Street. The driveways run north and south. There are passage ways in Hoyle Bros.' lumber yard. They run east and west. People frequently pass through Lyon's lumber yard.

C. J. English, for the State, testified, that he resided in the city and county of Dallas, and on the 20th day of May he was clerking in Bauman's Bankrupt Store, on Elm Street, in said city and county, of the State of Texas; that on the evening of that day, which was a rainy evening, the defendant and a little girl came into the store somewhere near 6 o'clock, and the man asked to look at some shoes for the little girl. I showed him some shoes for $2, and he looked at them and then asked if I didn't have a cheaper pair; but I didn't have any cheaper ones that would fit her. He took the shoes I first showed him. I offered to put them on the little girl, but he said that he would do it, and he put them on her. I also sold him a pair of stockings for the little girl. After he had put them on they went out of the door, and I think she started one way and he the other. I heard him tell her to tell her papa the reason he had kept her so long was that he was getting her some shoes. The little girl had nothing in her hands when she came into the store.

Dr. Gibbs, for the State, testified: I have been a practicing physician for many years in Dallas. On the evening of the 20th of May of this year I was called in to see Roda May Dexter. Dr. Burton and myself made the examination of the child about 8 o'clock that evening. We first made an ocular examination, and found her parts swollen, bruised, and exquisitely tender. There were also finger prints on her thighs. We gave the child chloroform and made a digital examination. The inside of the vagina was lacerated, and blood had oozed from it and clotted upon the inside to some extent. The hymen was ruptured, and there had been penetration, without doubt.

Cross-examined: The entrance of the vagina was of normal size for a child of her age. It would cause pain to force a full grown penis into the privates of a child 10 years old, and would cause her to cry out, unless suppressed, or unless fright or terror rendered her less suscept-

ible to pain, and then subsequent prostration would follow. We found this child very much prostrated. That part of the human body is not the most sensitive to pain. I think after penetration, as we found it in this case, she could walk for twenty or thirty minutes, and perhaps an hour, and then subsequent prostration set in as in this case; that it would prostrate some children at the time, and others it would not. The hymen varies some, but is usually about an inch from the labia.

Dr. Burton, for the State, testified: I am a practicing physician. Had occasion to examine Roda May Dexter on the evening of the 20th May last, about 8 o'clock. Dr. Gibbs was there when I arrived. On examination by inspection I saw stains of blood and also some lacerations of the posterior vagina. The little girl was in so much pain we gave chloroform, and then made a digital examination and found the hymen ruptured. In fact, I could feel shreds of it hanging during my examination. There were lacerations of the vagina. There was some blood on the posterior of the vagina, but most of it was in clots on the inside. There had been penetration of the vagina.

Cross-examined: In such cases excitement, fright, etc., operate to lessen pain at the time, and subsequent prostration follows. I think a child penetrated as this one was could walk three or four blocks and then back five or six home, and then go a hundred yards to the store for coal oil, and return, and then subsequent prostration follow, as it did in this case. In case a female child under 10 years was subjected to penetration by an adult male (to the extent of rupturing the hymen) for fifteen or twenty minutes, on a pile of lumber, the immediate and proximate result on some children might be prostration at the time, and on others it would not. And as I said before, excitement and fright operate to lessen the pain at the time. The hymen is usually about an inch from the external part of the vagina. It varies a little, but not much.

John T. Eckland, for the State, testified: I know the defendant A. L. Rodgers. I first knew him at the jail. I was a trusty at the jail. I remember the night he was put in jail. On the next morning Jailer Rhodes told me to go in and get Rodgers' drawers. I went to get them, and told him I wanted them. He pulled them off and gave them to me, and asked me if I wanted his undershirt. I told him no, the drawers were all I wanted. I gave the drawers to Mr. Rhodes, the jailer, and think the sheriff now has them. The drawers had a spot of blood on the front of them. [The drawers were produced, and witness identified them as the drawers of defendant and identified the spot of blood.]

Cross-examined: I was sent to jail for a conviction for an aggravated assault and battery. I have been pardoned by the Governor. No, sir; I was not acting as assistant jailer. Mr. Rhodes merely told me to get the drawers of defendant, and I did so.

Mrs. A. Pool, for the State, testified: I am the mother of Mrs. Clara Dexter. Mrs. Clara Dexter is the wife of S. T. Dexter. I was present at the marriage. They were married in Ellis County, Texas, on the 11th day of August, 1880. I was not present at the birth of Roda May Dexter, but she was born on Monday, the 27th day of June, 1881, and I got there the following Sunday.

The State then introduced the drawers and underskirt of Roda May Dexter, and the drawers of the defendant, the little bag of candy, and the date of Roda May Dexter's birth in the Bible, and rested.

Mrs. J. E. Rodgers, for the defense, testified: I am the wife of the defendant. We were married about eighteen months ago, in San Antonio, and came to Dallas last February. I first became acquainted with Mr. Rodgers in Dallas. Defendant has a brother in San Antonio engaged in the grocery business. We have lived on Elm Street, East Dallas, since we have been here. My husband was engaged in the sewing machine business at the time of this occurrence, and we resided at the Central Hotel, on Elm Street, near the Union Depot. My husband worked for G. A. Stowers & Co.'s installment house in San Antonio for about two months, and then for a company for about two months, and since we have been in Dallas he has worked for the New Home Sewing Machine Company. I saw the little girl Roda May Dexter four days after the occurrence. I went to see her at their house. They lived on Collin Street, about three blocks from where I now live. When I went to see the little girl she was in bed. I don't know her condition. I only went to the door. On the day of the alleged rape my husband left home at 7 o'clock in the morning and came home at 6 o'clock that evening. There was nobody at home except myself. My husband was drinking when he came home, and could hardly walk straight. He never left home at all that night until about 11 o'clock, when he was arrested. He had retired when he was arrested. Up to this time I had not heard what was the matter. I saw him the next morning at the jail. The night before his arrest he spent the night at home. When Mr. Rodgers is drinking he has not the power to have intercourse with a woman. I saw the drawers my husband had on when he was arrested, and the spot of blood on them came from me the night before he was arrested. I was sick with my courses, very sick, and he attempted to have intercourse with me. I saw the blood on his drawers the next morning while he was dressing, and I called his attention to it. I have been confined to my bed for the last few days with my courses and womb trouble, and was brought here in a carriage.

Cross-examined: My room is up stairs in the Central Hotel. Mrs. Sherrer is the proprietress. There are ten or twelve families up there. I got home at 6 o'clock, and he got there about the time I did. It had been raining, and my husband got caught in the rain. He had conversation with me as usual. Had no conversation with me about what had

occurred, or about his buying a little girl a pair of shoes.  I never stated when I went to Dexter's that I believed it was true, and that I would never have anything more to do with him.  I lived in Oak Cliff about a month.  I had been sick about three days when Mr. Rodgers attempted to have intercourse with me and got blood on his drawers. I am in delicate health and suffer great pain all the time I am sick with my courses.  Have been in delicate health ever since I was married almost.  The spot of blood was on one side of the drawers, down near where they join together.  Mr. Rodgers had changed his clothes Sunday, and I saw the blood on the Wednesday morning after Tuesday night.  I called to see him several times in jail.  Mr. Rodgers was married once before.  I think his first wife is dead.  When Mr. Rodgers is drinking he has no disposition to do anything.  Mr. Rodger's didn't wear glasses on that day; didn't have chin whiskers; had a mustache.

Henry Murray, for the defense, testified:  I am working in O. T. Lyon's lumber yard; have been there over two years.  I remember the day of the alleged rape.  I was working at Mr. Lyon's lumber yard on that day and in the evening until about 5 o'clock.  I never saw Mr. Rodgers and a little girl come through Mr. Lyon's yard.  Phelan's stand is just across Ross Avenue from the lumber yard.  If there had been any unusual noise in Hoyle Bros.' lumber yard I don't think I would have heard it.  Hoyle's yard is about two blocks from Elm Street.  It is about two hundred yards from Hoyle Bros.' yard to the corner of Elm and Griffin streets.

Cross-examined:  It rained that evening between 5 and 6 o'clock. I generally stop work when it rains and go under a shed or in the office. Some two or three alleys or driveways with large double gateways at each end run through Lyon's lumber yard north and south from Ross Avenue to Camp Street.  Persons ordinarily go through, and I never see or notice them.

Rudolph Suffall, for the defense, testified:  I am foreman for O. T. Lyon.  I read of the rape the next morning in the paper.  I generally stay at the yard until half-past 6 o'clock, and am the last man out.  I do not know the defendant or Roda May Dexter.  I did not see the defendant and Roda May Dexter or any other man and little girl pass through Lyon's lumber yard.  There were eight or ten men working in the yard up until it rained.  There were eight or ten men at work in the yard on that day.  Hoyle Bros.' yard is near ours, but the street and the wagon yard are between it and ours.  I heard no unusual noise that evening.

Cross-examined:  There are four or five driveways between the lumber and lumber sheds in Lyon's yard, where people pass through from Ross Avenue to Camp Street toward Hoyle Bros.' yard.  You have to go down Camp Street and then pass through a wagon yard to get to Hoyle Bros.', and you can't well pass through from the wagon yard

into Hoyle Bros.' yard. There is no alley or passway between them. To go from our yard to Elm Street, you usually go down Camp or Ross Avenue to Griffin, and then on Griffin to Elm, or up Camp or Ross Avenue to Sycamore, and on Sycamore to Elm. There are no regular passways going toward Elm between Sycamore and Griffin streets. It rained a little after 5 o'clock, and we all went in.

Joe Lambert testified, for the defense: I am yardman at Hoyle Bros.' lumber yard, and have been there for about nine months. I do not know the defendant, and do not know Roda May Dexter. I remember the day of the occurrence. I was working in the yard on that day. I don't know what I was doing about 5 o'clock. I think I was in the office. We work about five men. It was raining, and the men had put up their teams and quit work. I never saw a man and little girl in the yard or pass through the yard. I don't think I heard any cries of distress on that evening. There are secret places in our yard where a man could commit rape and no one know it. I was working in the yard that evening. About 5 o'clock it began raining a pretty hard shower; then I was in the office. I saw no one pass out of the yard. It is about four blocks from our yard to the Bankrupt Store.

Cross-examined: There is no passway from Routh's wagon yard into and through our yard, except a hole broken in the fence where one could get down and crawl through the fence and then through a vacant tier. I mean by a vacant tier, that all the lumber had been taken out but a small amount, which made a sort of a floor to the tier. This was the bottom tier, and the tier is about four feet square. There are other tiers above it and to the sides of it. I suppose the opening to this tier was about three and a half feet high. The sheds are laid off in racks or tiers, one above the other. This is a secret, secluded spot. As it began raining four of us went into the office and staid there, and if persons had been in this spot we could not have seen or heard them unless they had made considerable noise. None of the men were at work out in the yard after it began raining. Those that did not go in the office went off. Routh's wagon yard is on our north. Our passways run east and west. Our yard fronts Patterson Avenue, and our office is on Patterson Avenue, near the southwest corner of the yard. If I was at Routh's wagon yard gate on Camp Street, to go to Elm Street I would go down Camp west to Griffin Street, then on Griffin south to Elm. There is no way to get through Camp Street to Patterson Avenue except through the place described or through by the blacksmith shop west of Routh's yard over a kind of steps to Patterson Avenue, and then down Patterson Avenue to Griffin, and on Griffin to Elm. I made an examination with others on the next day, about noon, of the place where the hole was in the fence, and of the place where the rape is said to have been committed. I found on the ground between the fence and the vacant tier the tracks of a man and a child, and also

same kind of tracks on the lumber in the tier. The child's tracks were barefooted tracks. I also saw a little sack of candy there. [Witness identified sack of candy shown him.] The candy was in the moulding on the bottom of the vacant tier. Where these tracks and sack were found is about two hundred feet from the passway and the office. Parties could go out on the east or the west side of the office, and there was a large gate up at the southeast corner of the yard.

Joe Moss, for the defense, testified: I am engaged at hauling lumber at Hoyle Bros'. lumber yard. I remember of hearing of this offense. I have seen Roda May Dexter, and know where her father lives. On the evening of this occurrence I was working on a shed, and when it commenced to rain I went into the office and staid there until after 6 o'clock. Four or five men were working in the yard until the rain. There is no place to get through into our yard from Routh's wagon yard except by crawling. Down toward the blacksmith shop there is a picket broken off at the top, and a man could get over by climbing. I saw no man and little girl pass out of the yard that evening. I saw none in the yard. It is about six hundred yards from Hoyle Bros'. lumber yard to the Bankrupt Store, and from it is about three-fourths or one-half mile from the Bankrupt Store to where Roda May Dexter lives, Elm Street. I heard a noise of some kind back in the lumber shed while it was raining.

Cross-examined: There were none of the men out in the yard at the time it was raining. Three or four of us went into the office, and Mr. Single and the others had left before it began raining. None of the men were in the shed at the time of the rain. I heard a noise when I went into the sash room leading back from the office to look for my gum coat. I didn't know exactly what it was, but could tell it was human, and stepped to the door of the sash room and heard voices either in the lumber shed or in the back of Routh's wagon yard. It appeared a little as of moaning. I examined the place the next day and found tracks back of the lumber shed, and up on the lumber a man's tracks and barefooted child's tracks. The tracks were between the hole in the fence and the moulding rack and upon the moulding rack, and also tracks in muddy places between the sheds and the fence leading up east from the hole in the fence and the rack where the footprints were. I saw a little sack of candy lying in the rack opposite the hole in the fence. The candy was pointed out by Single. This was before dinner the next day. [The sack was shown him and identified by him.] There are three gates opening from the yard into Patterson Avenue—one on each side of the office and one at the upper corner of the yard.

Redirect: The voices were thirty or forty steps from the sash room.

L. Blaylock testified, for the defense: I am publisher of the Texas Christian Advocate and the Texas Farmer. I am acquainted with

Rodgers. Knew him in Austin. I went to school with him. Have known him since 1859. I hadn't met him but once or twice since 1863. I knew his brother. I am told he is in business in San Antonio.

James Scott, for the defense, testified: I live in the city. I know Rodgers. I remember the evening the rape is said to have been committed. I saw the defendant when he came home that evening. It was about 6:30 o'clock. He came in at the back door of my saloon. He was wet and muddy, and pulled off his coat and hung it on his arm and took a glass of beer. I knew defendant about eighteen years ago in Dallas. Knew him again about six months ago, when he came back. He seemed to be sober when he came in. He took one glass of beer, and went up stairs, and afterward came down and took another.

M. F. Hoyle, for the defense, testified: I am one of the proprietors of the lumber yard. I do not know the defendant. I know the little girl when I see her. There are nearly always men and teams in the yard, but on the evening in question there came up a rain about 5 o'clock, and we all went in the office. There were five or six men there when it began to rain. There is no passway between Routh's wagon yard and my lumber yard. The only way to get through is to crawl through and over the fence and lumber. If the man and little girl were in my yard I did not see them. I saw no man and little girl. I heard no unusual noise. I saw a place where the rape is said to have occurred. Saw no signs of a scuffle.

Cross-examined: I examined the place where the rape is said to have occurred the next morning, some time before noon. I found tracks there on the ground between the fence and the lumber, and tracks on the lumber. They were child's barefooted tracks and a man's tracks. I also saw a little paper bag of candy on the lumber, where the tracks were. [Identified the bag of candy.] There were same kind of tracks in low, muddy places between the fence and lumber, leading a little ways east from the hole in the fence and the tracks on the lumber where the candy was found. At the place where the hole is in the fence it is probably two or three feet from the fence to the ends of the lumber, but persons can not go along the fence but a few steps, for the lumber is shoved into the racks ends first toward the fence, and some of the lumber is sixteen feet long and some of it is twenty feet long. Where it is sixteen feet long it leaves a little space between the fence and the end of the lumber, and where it is twenty feet long it extends clear up to the fence, and one coming through this hole in the fence has to crawl through the rack where the candy was found, which was nearly empty. The rack is about four feet high from the bottom to the top, and is about a foot and a half from the ground and about one-half foot of lumber in the bottom, leaving a vacant space of about three and a half feet from the top of the rack down to the lumber. The passways in my yard do not run back toward Routh's wagon yard,

but run east and west. The candy was in the extreme back part of the yard, about one hundred and twenty feet from the back of the office. A person might remain there under cover all day and not be seen unless the pile of lumber was wanted.

A. L. Rodgers, defendant, testified: A. L. Rodgers is my name. At the time of this occurrence I lived on Elm Street. I came to Dallas February 4 of this year. I have lived in San Antonio since 1865. I have a brother, brother-in-law, and niece in San Antonio. My brother is a grocer, my brother-in-law a city detective. I was living up stairs in a two story brick building. I didn't know Mr. Dexter. I knew Mrs. Dexter slightly. I was in the sewing machine business—New Home sewing machine business. I got acquainted with Mrs. Dexter the 13th, 14th, or 15th of May of this year. I solicited the house to sell a machine, and I brought the machine at her request. I was at the house before this day. I saw the little girl at her mother's on Wednesday, the 20th of May. I went to her mother's to see about the machine. She said before that she would give me an answer on Wednesday, and I called. She spoke favorably of the machine and said she would like to have it, and I told her that she had better keep it. Little Roda May said, "Are you going to get me a milk shake?" I said "All right, if you want one." Her mother said, "Don't go away, Roda." She came on with me to Phelan's, and I think she took a lemonade or milk shake. Before this she was in my company and I asked her to take something. After we got the milk shake I asked her why she was not at school, and she said, "Mamma wants me this week," or something. I asked her why she didn't have on her shoes. She said she never had any. I said, "Little girls like you ought to have shoes." She said, "If I had some I would put them on." I told her I would get her some shoes. I did not know of this route through Lyon's lumber yard until she suggested it. The only lumber yard I was in was Lyon's. We went through Lyon's lumber yard to Camp Street, down Camp to Griffin Street, and on Griffin to Elm. I went to the Bankrupt Store with her. She suggested going to the Bankrupt Store, because they were selling girls' shoes cheap. She picked the shoes out herself. She brushed off her feet. I told her it was going to rain, and took her to Osborn's store, on the corner of Griffin and Elm, and told her to hurry on. I went on to a lady's up near Bryant Street and the Central Railway to see about another machine, and got home a little before 6 o'clock. I don't deny buying the little girl a pair of shoes. I have bought several children shoes. I bought a little boy a hat once. I was arrested on Wednesday night about 11 o'clock and carried right to jail. Eckland took my drawers the next day at the jail. He was a trusty in the jail. I knew that spot of blood was on them. I had got it on my drawers on Tuesday night. It came from my wife. I got to monkeying with her and got it on there from her. I knew it next morning, and said to her,

"Look there, what I got on my clean drawers." The way I happened to be at Mrs. Dexter's so often was, I was cleaning a machine right below Mrs. Dexter's. Yes, sir; there is one thing more I want to say. I never treated the little girl but once before, when she was going to market. I never went along with her but once and treated her. I have no erection when I am under the influence of liquor; no erection at all. I am not guilty of raping Roda May Dexter.

Cross-examined: I will be 42 years old my next birthday, the 16th of May. I had not had any definite contract with Mrs. Dexter about the machine, and none had been drawn up. She had not paid anything on the machine. She didn't tell me to take the machine away— that she couldn't buy it. I did not know the lady where I went to see about the other machine when I sent Roda May home from Osborn's corner. I don't know the number of the house; don't know what kind of a house it was. No, sir; don't think it was a concrete house. It is out beyond the Central Railway. I don't know the little boy I gave the hat to, and don't know where he is. We were at Phelan's stand about ten minutes. I didn't take Roda May by the arm and lead her from home when she was lingering. I don't think it sprinkled rain until after we got to Phelan's. Had the conversation about the shoes after we passed out of Phelan's. I told her she could get her little sister some cream cakes. Yes, sir; I gave her a milk shake at Osborn's grocery store. It is not true that I went in the wagon yard gate, and through Routh's wagon yard. We didn't go into Hoyle Bros.' lumber yard. After I had purchased the shoes a heavy rain came up. We remained in the shoe store about ten minutes. I had been with Roda May about three-fourths of an hour when we separated at Osborn's grocery store. She had been in my sight and presence at the time we separated at Osborn's grocery store ever since she left home with me. After I went home and up stairs I came down again into Scott's saloon. Mrs. Rodgers said I hadn't left the place. I didn't leave the place. Scott's saloon is not in the same building we lived in. It is down stairs, adjoining the building we lived in. I remained in the saloon a short time. I put the drawers on Sunday before this occurrence. I did make the statement to Eckland at the jail, and at the time he took my drawers, that I had got that spot of blood on them the week before. [A receipt, of which the following is a copy, was shown the defendant:]

"DALLAS, TEXAS, May 19, 1891.

"Received from Mrs. C. Dexter fifty-five dollars as part payment on lease No. ——.

"THE NEW HOME SEWING MACHINE COMPANY,

"$55.                                    "Per A. L. RODGERS.

"This receipt good for first payment only."

I did not sign that receipt. It is not my handwriting. I never had that receipt with me on the 20th of May. Never lost it in Hoyle's lumber yard. Never filled it out. [The witness was here shown his application for a continuance filed in this case, and asked whether the signature to said application was written by him, and he answered that it was. The State's attorney then exhibited to the jury the receipt and the signature to the application for continuance for comparison of the handwriting.] I have no power of erection when under the influence of liquor. May have lots of it in my head, but can't do anything. I wore no glasses and had no chin whiskers on the 20th of May, 1891.

Here the defense rested.

J. Lambert, for the State, testified, on being shown the above receipt, that he was working at the lumber yard in which the candy was found and where the tracks were, and while moving the lumber found the receipt shown him in between some of the lumber where it had fallen in a crack.

Cross-examined: I found the receipt five or six days after the arrest, when I went to get out some of the lumber.

The defendant's counsel asked that the evidence of its discovery be stricken out, because the time when it was found was too long after the occurrence to be *res gestœ*, which the court did, and instructed the jury to that effect.

John T. Eckland, for the State, testified: The defendant told me in the jail on the day after he was put in that he got the blood on his drawers a week before that.

A. J. Merrick, for the State, testified: I am the manager of the New Home Sewing Machine office. I know the defendant A. L. Rodgers. He had been in my employ, and was on the 20th of May of this year. I am familiar with the defendant's handwriting. [The receipt was shown witness.] That is one of the New Home printed receipts, and is filled out in the defendant's handwriting, and that is his signature to it.

*M. G. Anderson*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—This an appeal from a judgment of conviction for rape, with the death penalty assessed.

As stated in the charging part of the indictment, it was alleged that appellant, "in and upon Roda May Dexter, a female, then and there under the age of 10 years, did make an assault, and the said A. L. Rodgers did then and there ravish and have carnal knowledge of said Roda May Dexter, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State."

The carnal knowledge of a female under the age of 10 years, with or without consent, and with or without the use of force, threats, or fraud, is declared by our statute to be *per se* rape.      Penal Code, art. 528.

It is insisted that the court erred in its charge in failing to instruct the jury with regard to force, or, rather, to explain the character and degree of force essential to the crime of rape, as declared by article 529 of the Penal Code, to the effect that the definition of "force," as applicable to assault and battery, applies also to the crime of rape, and it must have been such as might reasonably be supposed to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case.      This position is not maintainable. The court did not err in failing so to charge, because the question of force or assault does not enter into or become one of the parts or elements of rape committed upon a female under the age of 10 years. Carnal knowledge of such female is rape, without the use of any force.

Another objection is urged to the charge of the court with regard to the fact of penetration.      The charge is not obnoxious to the objection that it was in contravention of article 532 of the Penal Code, and that it was also upon the weight of evidence.      The charge instructed the jury that to warrant a conviction for rape the fact of penetration must be established beyond a reasonable doubt, and explained what penetration meant.      This further language is used:      "It is not necessary that the act of copulation should have been complete, but penetration only as above explained is necessary to be proved, though such penetration need not have been to any particular depth."      This is, we think, a proper construction to be placed upon article 532 of the Code.      Penetration, whether with or without injection or emission, is sufficient, if proved, on trials for rape.      Johnson v. The State, 27 Texas Ct. App., 164; Willson's Crim. Stats., secs. 913, 915.

There is no question as to the evidence upon this point.      Two medical experts who examined the little girl within a very short time after the alleged rape testify most positively and emphatically that her private parts had been penetrated and the hymen ruptured.      In so far as the charge of the court is concerned, it is a plain, concise, fair, and full exposition of all the law applicable to the case.

The court did not err in admitting the testimony of the witness J. T. McGuire as to meeting the parties and hearing a conversation between them just prior to the alleged rape.      The witness' testimony upon this point corresponds most closely with the time and place and conversation testified to by the prosecutrix, and for that matter other witnesses also testify to seeing them at the time and place mentioned.

Nor did the court err in permitting the aunt of the injured female to take a seat by the side of the prosecutrix during the time she was being examined.      The evidence shows the prosecutrix to have been a girl

under 10 years of age, and the judge's qualification of the bill shows,. that while he permitted the aunt of the witness to sit by her during her examination, he warned the former not to speak to or prompt the witness, which warning was in no manner violated by the aunt. These are: the only two bills of exception found in the record.

While the defendant A. L. Rodgers was upon the stand testifying in his own behalf, a certain receipt, purporting to be signed by him on May 19, 1891, and which was a receipt, though never delivered, to Mrs. C. Dexter for $55, as part payment on a lease to the New Home Sewing Machine Company, was shown to the witness, and he denied that he had ever signed the receipt, stating that it was not in his handwriting, and that he never had that receipt with him on the 20th day of May (the date of the alleged rape). The instrument and signature were proved to be in his handwriting.

Lambert, a witness for the State, testified, on being shown said receipt, that he was working at the lumber yard some five or six days after the rape, and that he went to get out some lumber in the rack in which the rape is shown to have occurred, and while moving this lumber found the receipt shown him between some of the planks, where it had fallen in a crack. Defendant's counsel asked the court to strike out this evidence, because the time the receipt was found was too long after the occurrence to be *res gestœ*, which the court did, and instructed the jury to that effect, telling them, that "they could only consider the receipt in determining the credibility of the witness, and for no other purpose; that there was no evidence before them as to where the said receipt was found or procured." No error prejudicial of the rights of defendant is shown in regard to this matter.

We are inclined to believe that the finding of the receipt, and the receipt itself, were admissible as original evidence against the defendant. While it is true that several days had elapsed between the day of the offense and the finding of the receipt, yet the facts and circumstances of the finding are of such character as preclude the idea that such a receipt could have fallen between the cracks in the planks at that particular place, or was conveyed and put at said place by any third party; and the circumstances of finding the receipt, under the conditions stated by the witness, he not being shown in any manner to have taken any particular interest in or been in any way connected with the parties to the transaction, tend most strongly to corroborate the testimony of the prosecutrix.

It is unnecessary for us to go into a resume-of the facts going to establish this crime. Suffice it to say that the testimony, in so far as the prosecutrix is concerned, and she seems to have been unusually intelligent for one of her tender age, is most conclusive, and, if true, there can not be the slightest doubt of defendant's guilt as charged. In ad-

dition to this direct and positive testimony, the circumstances which have been adduced to corroborate it are overwhelming, and the unprejudiced mind, reviewing the facts, must necessarily be forced to the conclusion that the State has maintained and established its charge against defendant beyond all reasonable doubt.

Upon this testimony, the jury and the court below, in the exercise of their authority under the law, have seen fit to impose the highest penalty known for this crime; and the trial being a fair and impartial one, in which no reversible error is made to appear, we do not feel that we would be warranted in interfering with the judgment, and it is therefore affirmed.

*Affirmed.*

Hurt, J., absent.