# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 2 6 2013



~~~ CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Sept 26, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 87929-0 |
| Respondent, | ) | |
| | ) | En Banc |
| v. | ) | |
| TIMOTHY DYE, | ) | |
| | ) | Filed _____ SEP 2 6 2013 _____. |
| Petitioner. | ) | |

WIGGINS, J.—This case requires us to determine whether a court may allow a witness to be accompanied by a comfort animal, here a dog, when testifying during trial. Generally, we give trial courts wide discretion to control trial proceedings, including the manner in which testimony will be presented. We recognize that some trial procedures, such as providing a child witness with a toy on the stand or shackling a defendant at trial, may risk coloring the perceptions of the jury. But trial courts are capable of addressing these risks. Here, the trial court acted within its broad discretion when it determined that Ellie, the facility dog provided by the prosecutor's office to the victim Douglas Lare, was needed in light of Lare's severe developmental disabilities in order for Lare to testify adequately. We affirm the Court of Appeals.

FACTS

I. Background

Douglas Lare suffers from significant developmental disabilities, including cerebral palsy, Kallman Syndrome, and mild mental retardation. He has an IQ of 65 and, although he is 56 years old, he functions at a mental age ranging from 6 to 12 years old.[1] While he lives independently and has been working for the Veteran's Hospital for 23 years, Lare has difficulty with daily household activities, reading, and writing, and he uses a payee service to handle his finances.

In 2005, Lare became romantically involved with his neighbor Alesha Lair.[2] Alesha was also dating the defendant, Timothy Dye, a fact that she did not reveal to Lare. In 2007, Alesha moved into Lare's apartment, along with Alesha's sister, her mother, and her mother's boyfriend. Alesha opened several credit cards in Lare's name and charged them to their limits, using them to buy herself and her family clothing, shoes, computers, beer, cigarettes, a DVD (digital video disk) player, and cell phones. Alesha also withdrew money from Lare's retirement account.

When Alesha and her family moved out of Lare's apartment, Alesha used Lare's money to furnish her new apartment, and Dye moved in with Alesha. Alesha took a key to Lare's apartment with her. In total, Alesha borrowed approximately

---

[1] The defense characterizes Lare's mental age as between two and a half years and eight and a half years.

[2] Because of the similarity of Lair and Lare's names, Alesha Lair is hereinafter referred to by her first name. No disrespect is intended.

$42,000 against the credit cards in Lare's name and withdrew $59,000 from Lare's retirement account.[3]

On January 19, 2008, Lare called 911 to report a DVD player and DVD missing. On January 24, Lare woke up to find Dye rummaging through his apartment. Dye asked Lare if he could take a DVD player and VCR (videocassette recorder), but Lare refused. Dye nonetheless took some DVDs and a shelving unit. The following day, Lare came home from work to find his front door propped open. His television, VCR, DVD player, microwave, and a collectible knife were missing. In a telephone interview with a police detective, Dye admitted that he had pawned Lare's DVD player but claimed that Lare had voluntarily offered it to him. After the detective stopped the recording, Dye told her that "he didn't have anything to worry about because his name wasn't on any of the pawn slips and so there was no way to pin it on him." Report of Proceedings (RP) (Dec. 6, 2010) at 6.

After the burglaries, Lare became very fearful. He installed three locks on his front door and began sleeping with mace, a frying pan, and two knives in his bedroom for protection.

II.    Trial and Appellate Proceedings

The State charged Dye with residential burglary in connection with the January 24 incident, alleging as an aggravator that Lare was a vulnerable victim.

---

[3] Alesha later pleaded guilty to theft in the first degree with the aggravating circumstance that Lare was a particularly vulnerable victim. Alesha's guilt is not at issue in this case and is not further discussed.

During Lare's defense interview, he was accompanied by a facility dog,[4] Ellie. Ellie is a golden retriever used by the King County Prosecuting Attorney's Office to comfort children who are giving statements and testimony. Ellie was trained by, and lives with, the prosecutor at Dye's trial.

Lare then requested Ellie's presence during his testimony at trial. The State moved to allow Ellie to accompany Lare during his testimony, arguing that Lare needed Ellie's assistance because of his "significant anxiety regarding his upcoming testimony" and because he "functions at the level of a child and is fearful of the defendant." Clerk's Papers (CP) at 104. The State further added during a pretrial hearing that Lare was a "complete dog fan" and that Ellie had provided Lare "tremendous comfort" during the previous interview. RP (Nov. 18, 2010) at 28.

Dye's counsel said that she did not object to Ellie's presence "if [Dye] gets to hold his baby while he is testifying," arguing that "the prejudice is extreme, allowing the alleged victim in this case to pet the dog." *Id.* The trial court disagreed, noting that Lare was a "developmentally disabled individual who has . . . significant emotional trauma." *Id.* at 29. The court found that Ellie would be

> very unobtrusive, will just simply be next to the individual, not be laying [sic] in his lap, and if we can accommodate somebody who has a developmental disability when they're testifying in the courtroom I think it's appropriate to do so.

---

[4] The defense characterizes Ellie as a "comfort dog," Pet'r's Suppl. Br. at 1, a "therapy dog[]," Pet. for Review at 8, or a "support dog," Br. of Amicus Curiae Wash. Defender Ass'n & The Defender Ass'n at 1. However, the Court of Appeals adopted the term "'facility dog,'" *State v. Dye,* 170 Wn. App. 340, 343 n.5, 283 P.3d 1130 (2012), and we do the same.

4

*Id.* The court then suggested that if Dye had a similar disability, the court might be receptive to allowing Dye to hold his baby on the stand.

Dye's counsel also argued that Ellie's presence might inflame Dye's allergies or distract the jury. The court offered to accommodate Dye's allergies so long as he could provide medical documentation of them. There is no indication in the record that Dye did so.

At trial, Ellie sat with Lare during his testimony and accompanied him to the restroom. Lare also fed Ellie treats and used Ellie as a table while reading an exhibit. Ellie's presence is not otherwise indicated in the record except for her introduction at the beginning of Lare's testimony:

Q. . . . . Who's your friend there with you?

A. This is Ellie.

Q. And why is Ellie there with you?

A. Ellie is to help me and to make it easier for me. And I have treats here.

RP (Dec. 1, 2010) at 10. At the end of the trial, the court instructed the jury not to "make any assumptions or draw any conclusions based on the presence of this service dog." CP at 53.

The jury convicted Dye of residential burglary but did not find that Lare was a vulnerable victim. *State v. Dye,* 170 Wn. App. 340, 344, 283 P.3d 1130 (2012). Dye appealed his conviction and the Court of Appeals affirmed the trial court, holding that Ellie's presence did not compromise Dye's right of cross-examination, that the prosecutor did not improperly give Lare a gift, that the trial court properly balanced

Lare's special needs against the possibility of prejudice, and that there was no prejudice in the first instance. *Id.* at 346-48. Dye appealed on the ground that Ellie's presence violated his right to due process and a fair trial.

## ANALYSIS

### I.  Standard of Review

The trial court is generally in the best position to perceive and structure its own proceedings. Accordingly, a trial court has broad discretion to make a variety of trial management decisions, ranging from "the mode and order of interrogating witnesses and presenting evidence,"[5] to the admissibility of evidence,[6] to provisions for the order and security of the courtroom.[7] In order to effectuate the trial court's discretion, we grant the trial court broad discretion: even if we disagree with the trial court, we will not reverse its decision unless that decision is "manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield,* 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

Alleging that a ruling violated the defendant's right to a fair trial does not change the standard of review. For example, we have reviewed for abuse of discretion a trial court's ruling requiring the defendant to attend trial in shackles. *State v. Finch,* 137 Wn.2d 792, 852, 975 P.2d 967 (1999); *State v. Hartzog,* 96 Wn.2d 383, 401, 635 P.2d 694 (1981). We have consistently reviewed courtroom

---

[5] ER 611(a).

[6] *State v. Stenson,* 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

[7] *State v. Jaime,* 168 Wn.2d 857, 865, 233 P.3d 554 (2010); *State v. Hartzog,* 96 Wn.2d 383, 401, 635 P.2d 694 (1981).

procedures—allegedly prejudicial or not—for abuse of discretion standard, and Dye presents no reason for us to depart from that standard now.

## II. Abuse of Discretion

A trial court abuses its discretion only if any of the following is true:

(1) The decision is "manifestly unreasonable," that is, it falls "outside the range of acceptable choices, given the facts and the applicable legal standard";

(2) The decision is "based on untenable grounds," that is, "the factual findings are unsupported by the record"; or

(3) The decision is "based on untenable reasons," that is, it is "based on an incorrect standard or the facts do not meet the requirements of the correct standard."

*Littlefield,* 133 Wn.2d at 47. As a preliminary matter, the "manifestly unreasonable" and "untenable reasons" tests require us to determine a legal standard to use.

### A. Applicable legal standard

No controlling authority in Washington decides whether a dog may accompany a witness during testimony. We have found only two on-point published cases from other jurisdictions: *People v. Tohom,* 969 N.Y.S.2d 123 (N.Y. App. Div. 2013), and *People v. Spence,* 212 Cal. App. 4th 478, 151 Cal. Rptr. 3d 374 (2012). In both cases, the witness at issue was a young girl who had been raped by her father. *Tohom,* 969 N.Y.S.2d 123; *Spence,* 212 Cal. App. 4th at 485. The witness in *Spence* was crying and upset as she recounted the events to health workers. 212 Cal. App. 4th at 485-86. Accordingly, the prosecutor moved for a "therapy dog" to be present on the witness stand with the victim, citing concerns that the witness might have an "emotional meltdown and refuse to testify." *Id.* at 512. The trial court granted the motion, ruling that "it was reasonably probable that testifying might be

an intimidating situation for [the witness]," *id.*, and that the dog was known to be nondisruptive. The appellate court agreed, deferring without analysis to the trial court's "implied findings of necessity."[8] *Id.* at 518. Similarly, in *Tohom,* the witness was experiencing symptoms of posttraumatic stress disorder and did not feel comfortable testifying because her family members blamed her for the situation. 969 N.Y.S.2d at 126-27. The trial court permitted the dog to be present during the witness's testimony and the appellate division affirmed, citing the trial court's discretion to "fashion[] an appropriate measure to address a testifying child witness's emotional or psychological stress, based upon the particular needs of that child." *Id.* at 132-33 (citations omitted).

The Court of Appeals has held that a child witness may hold a doll during testimony. In *State v. Hakimi,* 124 Wn. App. 15, 18, 98 P.3d 809 (2004), the two witnesses were young girls who had been allegedly molested by their babysitter, Morteza Hakimi. Hakimi moved to prohibit the witnesses from carrying a doll to the witness stand. The trial court heard argument on the motion, including testimony by an expert in child interviewing that "girls in particular in the 9–year–old age range may find security and comfort by holding a toy while answering questions posed to them during examination at trial." *Id.* at 21. The trial court weighed the interests of the witnesses against the potential prejudice to Hakimi and denied Hakimi's motion, stating that

---

[8] Defense counsel suggests that the result might also be attributed to a California statute allowing vulnerable victims to appear accompanied by support persons. CAL. PENAL CODE § 868.5. However, the court in *Spence,* 212 Cal. App. 4th 478, did not rely on this statute. Furthermore, Washington has a similar support person statute. RCW 7.69A.030(3).

the doll will not be the subject of any questioning . . . . [C]hildren do present different issues and different considerations in terms of being witnesses in different cases. They have a peculiar need to find some security in an otherwise insecure setting, I suspect.

I don't think the doll unduly prejudices, to the extent it prejudices anyone at all; so I will allow it.

*Id.* at 20. The Court of Appeals affirmed the trial court, joining the many other jurisdictions that have permitted child witnesses to hold a doll, toy, or other comfort item on the witness stand,[9] or to be accompanied by a parent, victim advocate, or other trusted individual.[10]

Upon examining those cases that have allowed a child witness to use a comfort item or support person, a few important similarities and differences become clear. First, the cases are in largely universal agreement that abuse of discretion is the correct standard. *See, e.g., State v. Perovich,* 2001 SD 96, 632

---

[9] *See Smith v. State,* 2005 WY 113, 119 P.3d 411, 419; *State v. Perovich,* 2001 SD 96, 632 N.W.2d 12, 17; *State v. Dickson,* 337 S.W.3d 733, 743 (Mo. Ct. App. 2011); State *v. Powell,* 318 S.W.3d 297, 302 (Mo. Ct. App. 2010); *State v. McPhee,* 58 Conn. App. 501, 508, 755 A.2d 893 (2000); *State v. Marquez,* 1998-NMCA-010, 124 N.M. 409, 413, 951 P.2d 1070; *State v. Gibson,* 973 S.W.2d 231, 245 (Tenn. Crim. App. 1997); *Sperling v. State,* 924 S.W.2d 722, 726 (Tex. App. 1996); *People v. Gutkaiss,* 206 A.D.2d 628, 631, 614 N.Y.S.2d 599 (1994); *State v. Cliff,* 116 Idaho 921, 924, 782 P.2d 44 (Ct. App. 1989); *Commonwealth v. Amirault,* 404 Mass. 221, 243, 535 N.E.2d 193 (1989).

[10] See *Holmes v. United States,* 171 F.2d 1022, 1023 (D.C. Cir. 1949); *Baxter v. State,* 522 N.E.2d 362, 365 (Ind. 1988); *State v. Jones,* 178 W. Va. 519, 521, 362 S.E.2d 330 (1987); *State v. Rogers,* 213 Mont. 302, 307-08, 692 P.2d 2 (1984), *overruled on other grounds by State v. Olson,* 286 Mont. 364, 951 P.2d 571 (1997); *State v. Keeley,* 8 Utah 2d 70, 71-72, 328 P.2d 724 (1958); *Hortman v. Vissage,* 193 Ga. 596, 598, 19 S.E.2d 523 (1942); *Evers v. State,* 84 Neb. 708, 121 N.W. 1005, 1007-08, *rev'd on other grounds, State v. Brockman,* 184 Neb. 435, 168 N.W.2d 367 (1909); *Boatright v. State,* 192 Ga. App. 112, 116, 385 S.E.2d 298 (1989); *Stanger v. State,* 545 N.E.2d 1105, 1114 (Ind. Ct. App. 1989), *overruled on other grounds by Smith v. State,* 689 N.E.2d 1238 (Ind. 1997); *Commonwealth v. Pankraz,* 382 Pa. Super. 116, 125-26, 554 A.2d 974 (1989); *State v. Dompier,* 94 Or. App. 258, 261, 764 P.2d 979 (1988); *State v. Johnson,* 38 Ohio App. 3d 152, 154, 528 N.E.2d 567 (1986); *Brooks v. State,* 24 Md. App. 334, 342, 330 A.2d 670 (1975); *Rodgers v. State,* 30 Tex. Ct. App. 510, 528-29, 17 S.W. 1077 (1891).

N.W.2d 12, 17-18 ("A cold record invariably lacks the emotion of the occurrence below. It is obvious that a trial of this type takes its toll on both witnesses and the parties. Whether or not these emotions amount to circumstances that create an unfair trial is best addressed within the discretion of the trial court.").

Second, many of these cases involved highly egregious facts. *See, e.g., Holmes v. United States,* 171 F.2d 1022, 1023 (D.C. Cir. 1949) ("The child was a little girl of nine who had been subjected to a most terrible and horrifying experience [being raped, beaten and disfigured, and left unconscious under some leaves] to a degree which might well influence the balance of her life.").

Third, the courts are split on whether the prosecution must prove that the special measure is necessary to secure the witness's testimony. A number of courts have declined to require that the prosecution make a showing of necessity, instead putting the onus on the defendant to prove prejudice or impropriety. *See, e.g., State v. Dickson,* 337 S.W.3d 733, 743 (Mo. Ct. App. 2011) ("[T]here was nothing to suggest that the toys were used to engender the sympathy of the jurors; no reference to the teddy bears was made in the presence of the jury; and the witnesses were testifying about traumatic events."); *State v. Powell,* 318 S.W.3d 297, 303-04 (Mo. Ct. App. 2010) ("There is nothing to suggest that the stuffed animals were merely an attempt to cater to the emotional sympathy of the jurors. No reference was made to the teddy bears by any of the witnesses or counsel in the presence of the jury."); *Sperling v. State,* 924 S.W.2d 722, 726 (Tex. App. 1996) ("With nothing more in the record, we cannot conclude that the teddy bear constituted demonstrative evidence which engendered sympathy in the minds and

hearts of the jury, validated the child-victim's unimpeached credibility, or deprived appellant of his constitutional right of confrontation.").

Two states explicitly require the prosecution to show that a special measure is necessary to facilitate the witness's testimony. Delaware has adopted a "substantial need" standard, *Gomez v. State,* 25 A.3d 786, 798-99 (Del. 2011), and Hawaii has adopted a similar "compelling necessity" standard. *State v. Palabay,* 9 Haw. App. 414, 417, 844 P.2d 1 (1992).

Finally, several states have shied away from an explicit necessity test but nevertheless relied on a record that clearly indicated that the witness would have difficulty testifying in the absence of the comfort item or support person. *See Hakimi,* 124 Wn. App. at 21 (expert in child interviewing testified that doll could put young girls at ease); *Perovich,* 632 N.W.2d at 17 (witness refused to come to the stand when called, remaining in the back of the courtroom and crying); *State v. Cliff,* 116 Idaho 921, 923, 782 P.2d 44 (Ct. App. 1989) (child had dry heaves while testifying at preliminary hearing and had to be taken to restroom); *State v. Dompier,* 94 Or. App. 258, 260, 764 P.2d 979 (1988) (witness began crying on the stand and was unable to answer questions until foster mother was permitted to enter the stand with her); *Brooks v. State,* 24 Md. App. 334, 341, 330 A.2d 670 (1975) (witness "virtually fainted after being removed from the courtroom").

In a different vulnerable-witness setting, Washington and United States Supreme Court jurisprudence has required a showing of necessity to allow testimony via closed-circuit television. In *Maryland v. Craig,* 497 U.S. 836, 840, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), the prosecution sought to have the

witness—a young girl who had been allegedly molested by the owner of her kindergarten—examined and cross-examined in a separate room while those in the courtroom watched on video. The Court held that in order to overcome the defendant's confrontation clause right of "face-to-face confrontation," the trial court must make a case-specific finding of necessity. *Id.* at 855-56. That is, the trial court must hear evidence and "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Id.* at 856. We adopted the same rule in *State v. Foster,* 135 Wn.2d 441, 469, 957 P.2d 712 (1998), agreeing with the Court's reasoning in full.

Our confrontation clause analysis in *Foster,* 135 Wn.2d at 466-70, and our fair-trial analysis in *Finch,* 137 Wn.2d 843-46, show that where special courtroom procedures implicate constitutional rights, it is not the defendant's burden to prove that he or she has been prejudiced, but the prosecution's burden to prove that a special dispensation for a vulnerable witness is necessary. The present context is no different. However, we do not require a showing of "substantial need" or "compelling necessity" like Delaware, in *Gomez,* 25 A.3d at 798-99, or Hawaii, in *Palabay,* 9 Haw. App. at 417. Trial courts have a unique perspective on the actual witness that an appellate court reviewing a cold record lacks; because the trial court is in the best position to analyze the actual necessity of a special dispensation, we will not overrule the trial court's exercise of discretion unless the record fails to reveal the party's reasons for needing a support animal, or if the record indicates that the trial court failed to consider those reasons. Using this

standard, we now analyze whether the trial court's decision was based on untenable grounds, or based on untenable reasons, or manifestly unreasonable.

### B. Untenable grounds

A trial court's decision is based on untenable grounds "if the factual findings are unsupported by the record." *Littlefield,* 133 Wn.2d at 46-47. Here, the trial court found that Lare was a "developmentally disabled individual who has . . . had some significant emotional trauma" and that in contrast, Dye was "under no disability whatsoever." RP (Nov. 18, 2010) at 29. These findings are well supported by the record. Lare's sister testified as to the nature and extent of Lare's conditions. Lare himself testified to how the burglaries made him feel "very vulnerable and very scared." RP (Dec. 1, 2010) at 41.

The trial court also found that Ellie would be "very unobtrusive, will just simply be next to the individual, not be lying in his lap. . . ." RP (Nov. 18, 2010) at 29. Indeed, Ellie's conduct at trial supports the trial court's finding. The record does not indicate that Ellie ever disrupted proceedings, left Lare's side, or made any gestures toward Dye (growling, for instance) that would have made him look dangerous or untrustworthy. Because the trial court's decision to allow Ellie to be present was predicated on findings based in the record, the trial court did not rely on untenable grounds.

### C. Untenable reasons

A trial court's decision is made for untenable reasons if "it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." *Littlefield,* 133 Wn.2d at 47. Under the standard discussed above, the

13

trial court's "implicit" finding of necessity was sufficient. *Dye,* 170 Wn. App. at 348. The trial court was made aware of Lare's "significant anxiety regarding his upcoming testimony," as well as his fear of Dye. CP at 104. The trial court expressly relied on Lare's "significant emotional trauma" and "developmental disability," RP (Nov. 18, 2010) at 29, when it allowed Ellie to accompany Lare on the witness stand. The trial court clearly understood that Ellie was needed in order to facilitate Lare's testimony, in light of his mental state. The trial court did everything but explicitly state on the record that Lare would not testify *but for* Ellie's presence, and the failure to do so does not constitute error. Our precedent does not call for magic words, but for "'a hearing with a record evidencing the reasons for the action taken . . . .'" *Hartzog,* 96 Wn.2d at 401 (quoting *State v. Hartzog,* 26 Wn. App. 576, 588-89, 615 P.2d 480 (1980) (alteration in original) (internal quotation marks omitted)). Because the trial court held a hearing on the permissibility of Ellie's presence, and because the record showed why Ellie's presence was needed to facilitate Lare's testimony, the trial court did not rely on untenable reasons.

*D. Manifestly unreasonable*

A manifestly unreasonable decision is one that is "outside the range of acceptable choices, given the facts and the applicable legal standard . . . ." *Littlefield,* 133 Wn.2d at 47 (citing *State v. Rundquist,* 79 Wn. App. 786, 793, 905 P.2d 922 (1995)). As we have noted above, the applicable legal standard gives broad discretion to the trial court, and the trial court based its decision on Lare's vulnerable mental state. Furthermore, there is no actual evidence on the record

that Ellie had the effect of distracting the jury, damaging the presumption of Dye's innocence, or otherwise tainting the proceedings. Dye argues that Ellie impermissibly bolstered Lare's credibility by giving Lare's testimony an "aura of truth and sympathy," Pet'r's Suppl. Br. at 5-6; that Ellie made Lare look pitiful to the jury and "presupposed the victimhood of the complainant," Pet. for Review at 13; that jurors may have believed Lare's stress was because he was telling the truth; that the trial prosecutor was Ellie's trainer and might have given Ellie conscious or unconscious behavioral cues; and that a defendant or defense counsel might have allergies or be uncomfortable around dogs, thereby impeding the defendant's right of cross-examination. None of these theories has any basis in the record. For example, far from being discouraged by Ellie's presence, Dye's counsel conducted an extensive cross-examination of Lare and discredited him by exposing numerous inconsistencies. *See* RP (Dec. 1, 2010) at 43, 61, 69-70, 72, 80, 87, 101, 120, 126-27.

It is the responsibility of a party alleging error to create a record of that error. If Dye's counsel had seen Ellie jump on Lare, make a defensive posture toward Dye, or engage in other prejudicial behavior, she could have noted such behavior for the record, or even asked the court to remove Ellie from the witness stand momentarily. Counsel did not. This court is not in a position to speculate about what *might* have happened at trial.

Furthermore, whatever subconscious bias may have befallen the jury was cured by the trial court's limiting instruction, which cautioned the jury not to "make any assumptions or draw any conclusions based on the presence of this service

15

dog."[11] CP at 53. Juries are presumed to follow instructions absent evidence to the contrary. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). No such evidence appears on the record here. The constitutional role of the jury prevents us from presuming—on the force of a bare allegation—that the jury "[made] a decision based on the dog's reaction and demeanor, not the witness's. . . ." Br. of Amicus Curiae Wash. Defender Ass'n & The Defender Ass'n at 14. And our own precedent compels us to respect the trial court's decision: whether or not we might have conducted the trial differently, we cannot say the trial court acted in a manifestly unreasonable manner.

III. Conclusion

Dye has failed to establish that his fair trial rights were violated. Any prejudice that resulted from Ellie's presence was minor and largely mitigated by the limiting instruction that the trial court gave. In contrast, the trial court ruled that Ellie's presence would be helpful in reducing Lare's anxiety and eliciting his testimony, and no evidence to the contrary appears on the record. Both the general trend of courts to allow special procedural accommodations for child witnesses and the deference built into the abuse of discretion standard require us to respect the trial court's decision in how to structure its own proceedings. While the possibility

---

[11] Dye alleges that the limiting instruction was an improper judicial comment on the evidence because referring to Ellie as a "service dog" implied that Lare was disabled. He argues that Lare's perceptions and cognitive abilities were central questions of fact for the jury and that implying that Lare was disabled suggested the answers to those questions for the jury. However, the only element that Lare's disability weighed on was the vulnerable-victim aggravator sought by the State, CP at 59, and the jury did not find that Lare was a vulnerable victim. Therefore, even if the court's reference to Ellie as a "service dog" presupposed Lare's disability, there was no prejudice.

that a facility dog may incur undue sympathy calls for caution and a conscientious balancing of the benefits and the prejudice involved, the trial court balanced the competing factors appropriately. The trial court did not abuse its discretion and the Court of Appeals is affirmed.

No. 87929-0

Wiggins, J.

WE CONCUR.

Madsen, C.J.

Owens, J.

Fairhurst, J.

Stephens, J.

González, J.

18

No. 87929-0

GORDON McCLOUD, J. (concurring)—Symbols matter in court. Judicial robes symbolize formality, decorum, and dignity. Our flag in the courtroom symbolizes the importance of American constitutional values. The witness's oath provides a reminder of the solemn duty to testify truthfully.

Some symbols convey such a powerful message about the criminal defendant's probable guilt that we bar their use. For example, we bar the government from forcing the defendant to appear at a jury trial in jail garb. *State v. Finch*, 137 Wn.2d 792, 844-45, 975 P.2d 967 (1999) (collecting cases). Similarly, we generally bar the government from forcing the defendant to appear at trial in shackles. *Id.*; *see also, e.g., Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). As this court recently stated regarding an electronic presentation by a prosecutor, "prejudicial images may sway a jury in ways that words cannot." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d

1

673 (2012) (citing *State v. Gregory*, 158 Wn.2d 759, 866-67, 147 P.3d 1201 (2008)).

The facility dog, Ellie, was a powerful symbol in this case. Indeed, that's why she was so important for Mr. Lare: her mere presence conveyed a deeply reassuring, yet silent, message of comfort, security, and support. I join the majority in concluding that the State showed the need for such a powerful symbol to assist Mr. Lare in testifying given the particular facts of this case.

But given the undisputed power of the dog's symbolic message, I disagree with the majority's conclusion that that is the end of the trial court's job. Instead, to maintain the symbolism of fairness in the courtroom, additional measures must be taken. Those measures must ensure that the jury decides the case based solely on the facts, rather than based—even in part—on the facility dog's silent message about Mr. Lare's status as a sympathetic and truthful victim who is worthy of support.

The defense in this case did not suggest any additional measures, except for what appears to be the sarcastic comment that Mr. Lare could testify with Ellie if Mr. Dye could testify holding his baby. But the trial court should have considered other measures to neutralize the facility dog's powerful symbolism in support of the alleged victim. *See, e.g., State v. Rodriguez*, 146 Wn.2d 260, 271-72, 45 P.3d

2

541 (2002) (listing steps that court should take before permitting an inmate witness—for either side—to testify in shackles).[1] For example, if the State's key witness is accompanied by a facility dog, then the defendant or the defendant's key witness might be accompanied by a facility dog. The purpose of the second facility dog need not be to provide symbolic support; its sole purpose could be to symbolize a level playing field in the courtroom. Alternatively, the witness might have been seated with the dog shielded from view before the jury entered the courtroom. The trial court should also be open to other suggestions in the future for neutralizing a facility dog's powerful symbolism.

The majority asserts that the court's instruction that the jury should ignore the dog in the room sufficed to guard against any possible prejudice to Mr. Dye. Majority at 15-16. I disagree. The majority bases this conclusion on the general rule that jurors are presumed to follow their instructions. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012) (citing *State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009)).

---

[1] The defense's failure to request equalizing measures, despite initially objecting, seems similar to a failure to request a curative instruction despite raising an objection. The failure to request a curative instruction does not waive the claim of error, *e.g., State v. Claflin*, 38 Wn. App. 847, 849 n.2, 690 P.2d 1186 (1984), and the failure to request an equalizing measure should not waive the claim of error here either.

That presumption, however, does not always apply. The courts recognize the reality that jurors are likely unable to follow certain instructions, like an instruction to ignore a codefendant's confession. *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). In fact, this court has noted that "[prejudicial] imagery" in particular "may be very difficult to overcome with an instruction." *Glasmann*, 175 Wn.2d at 707 (citing *Gregory*, 158 Wn.2d at 866-67). Thus, the presumption that jurors follow instructions is especially inapplicable where the challenged procedure—here, the presence of the adorable dog Ellie—is a procedure that works only because it provides such powerful symbolism.

Finally, the majority asserts that adding a claim that the challenged ruling "violated the defendant's right to a fair trial does not change the standard of review" and that the standard of review applicable to evidentiary errors still applies. Majority at 6. I agree that violation of a state rule concerning the conduct of the trial and control of the courtroom does not *necessarily* change the analysis from evidentiary error to constitutional error.[2] But a constitutional issue is presented when an error in the conduct of the trial—even one that would be subject to abuse of

---

[2] *Sawyer v. Smith*, 497 U.S. 227, 239, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990); *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990) (incorrect evidentiary rulings ordinarily not a basis for constitutional claim); *United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 953 (7th Cir. 1989) (claim based on "other crime" evidence not cognizable because error did not violate constitutional right to fundamental fairness).

4

discretion review if analyzed solely under state court rules—also violates a constitutional right.[3] The defense raised such an issue here. *E.g.,* Pet'r's Suppl. Br. at 3-4 (raising fair trial right under Sixth and Fourteenth Amendments to the United States Constitution).

Given the strength of the State's evidence in this case, however, any error involving Ellie was certainly harmless, under any standard of review. I therefore concur.

---

[3] *E.g., Miller v. Pate,* 386 U.S. 1, 6, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) (evidentiary error of admitting men's shorts with reddish brown stain amounted to constitutional error warranting federal habeas corpus relief because state knew at time of trial that the stain was not blood and, hence, conviction obtained by knowing use of false evidence); *White v. White,* 925 F.2d 287 (9th Cir. 1991) (granting habeas corpus relief based on petitioner's inability to confront adverse witnesses at parole revocation hearing); *Rivera v. Dir., Dep't of Corr.,* 915 F.2d 280, 281-83 (7th Cir. 1990) (granting habeas corpus relief because trial court improperly used hearsay rule to exclude codefendant's confession exculpating petitioner); *Thomas v. Lynaugh,* 812 F.2d 225, 230 (5th Cir. 1987) (admission or exclusion of evidence may violate constitution if the evidence is a "crucial, critical, or highly significant factor in the context of the entire trial" (citing *Mullen v. Blackburn,* 808 F.2d 1143, 1143-46 (5th Cir. 1987))); *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983) (where the violation of state's evidentiary rule has resulted in denial of fundamental fairness, habeas corpus relief will be granted); *Dickson v. Wainwright,* 683 F.2d 348, 350 (11th Cir. 1982) (fundamentally unfair state evidentiary rulings are basis for habeas relief). *Cf. Estelle v. McGuire,* 502 U.S. 62, 70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (leaving open question of whether violation of state evidentiary rule can amount to due process clause error).

Gordon McCloud, J.