**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85879-3-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| ANTONIAL MARQUETT MONROE, | |
| Appellant. | |

FELDMAN, J. — Antonial Marquett Monroe appeals his conviction for first degree assault and his sentence of life without release or parole (LWOP) as authorized under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570.[1]  We affirm.

I

Monroe shot Patrick Bertram in the back, paralyzing him for life, after Bertram stole from Monroe a brown leather bag containing, among other things, a black handgun.  Law enforcement arrested Monroe and charged him with assault in the first degree.

---

[1] Known as the "three strikes" law, the POAA authorizes LWOP where a person has been convicted of three "most serious offenses."  *State v. Reynolds*, 2 Wn.3d 195, 200, 535 P.3d 427 (2023).  We discuss the POAA in detail below.

At trial, Bertram testified that in the hours leading up to the shooting, a man and a woman who he did not know hired him to wash the man's car in return for three fentanyl pills. After washing the car, Bertram accompanied the man and woman while they picked up a truck, used the truck to tow a third car to the man's "ex-wife's" house, picked up the man's cousin in Tukwila, drove to and gambled at a casino in Marysville, purchased gas in north Seattle, dropped off the cousin at a light rail station, and then, finally, drove to the Lynnwood Municipal Court because the man had a hearing there. While the man was inside the courthouse, Bertram stole a brown leather bag containing a black handgun from the trunk of the man's car. Bertram fled with the bag and its contents, but the unidentified man found him several hours later, recovered the bag, and shot him.

The identity of Bertram's shooter was a significant issue at trial. Relevant here, testimony at trial established—and the parties subsequently stipulated—the shooter had a court appearance at Lynnwood Municipal Court the morning he shot Bertram. The State presented other evidence linking Monroe to the crime, including evidence that the car Bertram reported towing to a woman's house the night of the shooting was discovered to be Monroe's estranged wife's. It also presented evidence that Monroe possessed a bag matching the description of the bag Bertram stole from his assailant, which also contained a black gun as Bertram described. At the conclusion of the trial, the jury found Monroe guilty of assault in the first degree.

Under the POAA, a "persistent offender" is an offender who has been convicted of three "most serious offenses." RCW 9.94A.030(37)(a)(ii).[2] Applying the POAA at Monroe's sentencing hearing, the court found Monroe had previously been convicted of arson in the first degree and promoting prostitution. These convictions are both "most serious offenses" that count as strikes under the POAA. RCW 9.94A.030(32)(a), (m). Because Monroe's assault in the first-degree conviction was a third "most serious offense," the court sentenced Monroe to life in prison without the possibility of early release pursuant to the POAA. This timely appeal followed.

II

Monroe challenges his conviction on multiple grounds. We address each in turn.

A.    Courtroom Security

Monroe argues the trial court violated his right to a fair trial by allowing heightened courtroom security without individualized findings regarding the potential for prejudice. We disagree.

When a courtroom procedure—including routine security measures—is challenged as inherently prejudicial, courts consider whether "'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (quoting *Estelle v.*

---

[2] More specifically, a persistent offender is someone who "[h]as, before the commission of the offense under (a) of this subsection, been convicted as an offender on at least two separate occasions, whether in this state or elsewhere, of felonies that under the laws of this state would be considered most serious offenses and would be included in the offender score under RCW 9.94A.525; provided that of the two or more previous convictions, at least one conviction must have occurred before the commission of any of the other most serious offenses for which the offender was previously convicted." RCW 9.94A.030(37)(a)(ii).

*Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 1693, 48 L. Ed. 2d 126 (1976)). Courts "evaluate the likely effects of a particular procedure based on 'reason, principle, and common human experience.'" *State v. Butler*, 198 Wn. App. 484, 493, 394 P.3d 424 (2017) (quoting *Estelle*, 425 U.S. at 504). Also relevant here, "Allegations that a ruling violated the defendant's right to a fair trial do[] not change the standard of review." *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). Because "[t]he trial court is generally in the best position to perceive and structure its own proceedings," a trial court's ruling regarding security measures is reviewed for an abuse of discretion. *Id.* at 547-48. Accordingly, "[E]ven if we disagree with the trial court, we will not reverse its decision unless that decision is 'manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* at 549 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

Washington courts have held shackling, handcuffing, or gagging a defendant or holding a trial in jail is inherently prejudicial,[3] but have declined to hold the routine presence of security officers at trial is inherently prejudicial. For example, in *Butler*, a jail officer was present at trial because the defendant was in custody and an additional jail officer was present for a portion of a victim's testimony. 198 Wn. App. at 489. This court concluded the second officer's presence was not inherently prejudicial, as "[t]he second officer was not conspicuously close to Butler, did not obstruct [his] view of the witness, did not attract attention, and was not present for the remainder of the victim's testimony." *Id.* at 486. Similarly, in *State v. Gorman-Lykken*, 9 Wn. App. 2d 687, 695, 446 P.3d

---

[3] *See, e.g., State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967 (1999) (shackling, handcuffing, gagging); *State v. Jaime*, 168 Wn.2d 857, 864, 233 P.3d 554 (2010) (conducting trial in jail).

694 (2019), the court held there was no inherent prejudice when a corrections officer was stationed next to the witness stand during the defendant's testimony. The court noted the officer had been present throughout trial, there was only one officer, the officer did not draw attention to herself, and the defendant and the officer moved to and from the witness box outside the jury's presence. *Id.*

Here, as in *Butler* and *Gorman-Lykken*, there is no basis to conclude that the occasional presence of three security officers, by itself, was inherently prejudicial.[4] The record indicates that when three officers were present, one was stationed at the end of the jury box, one near the exit of the courtroom, and one about ten feet away from defense counsel's table and Monroe. The officers were seated, not standing, and they never were next to Monroe. No one suggested to the jury that Monroe required additional security in the gallery or was in custody. Thus, the presence of three officers for portions of the trial did not convey that Monroe was particularly dangerous or culpable and could just as easily be interpreted as a means to ensure order in the courtroom and protection from outside disruptions.

Recognizing that more may be required to show prejudice, Monroe's counsel emphasized at oral argument that jurors could reasonably infer that Monroe was particularly dangerous or culpable when, following a recess, some of the jurors entered the courtroom before Monroe and the officers were present. Counsel explained, "If it were not obvious merely from the number and placement

---

[4] The record indicates there were sometimes two officers and sometimes three; because our holding does not turn on this point, we focus on those instances where three officers were present as argued by Monroe.

of the officers throughout the trial, . . . the fact that those three officers were there specifically for Mr. Monroe became obvious midway through the trial when at least four jurors entered the courtroom and saw it empty with no jail officers and no Mr. Monroe . . . ."[5]  From this, Monroe's counsel argued it was "communicated [to the jury that] [the officers] were only present when Mr. Monroe was present and therefore were there specifically to guard him."[6]  Building on this incident, Monroe argued that these circumstances—which appellate counsel described as three officers "combined with the empty courtroom"[7]—required that the trial court make "individualized" findings or "some inquiry" on the record related to the above issues, explaining, "it is possible that the jurors saw the courtroom and . . . connected the officers to Mr. Monroe . . . and therefore the officers' presence without any individualized findings burden my client's right to a fair trial."[8]

Consistent with Monroe's argument, the court noted in *Gorman-Lykken* "the trial court must actually exercise discretion based on the facts of the case in considering whether to allow a courtroom security measure."  9 Wn. App. 2d at 695-96.  But the court there also noted, "For routine security measures *such as the presence of officers in the courtroom*, no specific inquiry on the record is required for the trial court's exercise of discretion."  *Id.* at 696 (emphasis added).  In any event, even if the circumstances here required a specific inquiry on the record as

---

[5] Wash. Ct. of Appeals oral argument, *State v. Monroe,* No. 85879-3-1-I (Jul. 11, 2025), at 2 min., 30 sec. to 2 min., 47 sec. (on file with court).
[6] Wash. Ct. of Appeals oral argument, *State v. Monroe,* No. 85879-3-1-I (Jul. 11, 2025), at 2 min., 47 sec. to 2 min., 53 sec. (on file with court).
[7] Wash. Ct. of Appeals oral argument, *State v. Monroe,* No. 85879-3-1-I (Jul. 11, 2025), at 8 min., 12 sec. to 8 min., 18 sec. (on file with court).
[8] Wash. Ct. of Appeals oral argument, *State v. Monroe,* No. 85879-3-1-I (Jul. 11, 2025), at 4 min., 13 sec. to 4 min., 34 sec. (on file with court).

Monroe argues, the trial court carefully considered on the record possible prejudice, such as the officers' placement in the room, how Monroe was dressed, and whether anything unusual and therefore prejudicial had occurred after defense counsel objected to the absence of officers when jurors entered the courtroom before Monroe was present. Addressing this specific concern, the court noted, "I don't think it would be obvious that those gentlemen have been custody officers." The court reasoned that the jury would have needed to have taken notice of the *absence* of both Monroe and the officers and additionally "understand that those uniformed officers are, in fact, custody officers instead of just courtroom security." The court then concluded "[t]here is nothing to indicate . . . that the defendant is, in fact, in custody unless one were to draw inferences" that the court characterized as "speculative." Thus, contrary to Monroe's argument, the trial court here appropriately exercised its discretion based on the facts of the case. Finding no abuse of discretion, we decline to grant relief on this point.

B.    Evidence Monroe Was On Probation

Monroe argues the trial court erred in denying his motion for a mistrial when a detective conveyed to the jury that Monroe was on probation, which violated an order to exclude evidence related to prior convictions. We disagree.

During pre-trial motions practice, the trial court granted Monroe's motion to suppress evidence of his prior convictions. At trial, a detective who investigated the shooting explained that he went to Lynnwood Municipal Court to determine whether Monroe had a court appearance on the day Bertram was shot. Relevant here, the detective testified, "I just went there in person and talked to the

employees and ended up talking with Mr. Monroe's probation officer who confirmed he was there." Defense counsel made a hearsay objection and moved to strike, and the trial court sustained the objection, struck the statement, and instructed the jury to disregard it. Shortly thereafter, the parties asked the court to read a stipulation to the jury, which indicated Monroe was present in Lynnwood Municipal Court on the day in question. Monroe requested a mistrial, which the trial court denied.

When a trial irregularity occurs, as here, the court must determine its prejudicial effect. *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). "In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). "[U]ltimately the question is 'whether . . . viewed against the background of all the evidence,' the improper testimony was so prejudicial that the defendant did not get a fair trial." *Gamble*, 168 Wn.2d at 177 (quoting *State v. Thompson,* 90 Wn. App. 41, 47, 950 P.2d 977 (1998)). A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). A trial court has "wide discretion to cure trial irregularities" resulting from improper witness statements. *State v. Post*, 118 Wn.2d 596, 620, 826 P.2d 172 (1992). When curative instructions are given, "[a] jury is presumed to follow instructions." *Gamble*, 168 Wn.2d at 178.

There was no abuse of discretion here. First, the jury already knew Bertram's assailant, later identified as Monroe, went to court the morning he

stabbed Bertram. The trial court reasoned that learning that Monroe had a probation officer, and had therefore been convicted of something, added only slightly to the prejudice that already existed. Second, the trial court struck the testimony at issue and instructed the jury to disregard it. The court concluded, "as things currently stand, I can't say without broadly speculating, very broadly . . . that the defendant can't get a fair trial. In fact, I think he can and will get a fair trial . . . ." The record thus shows the trial court considered the seriousness of the irregularity, whether it involved cumulative evidence, and whether the jury was instructed to disregard it, as *Gamble* requires.

Furthermore, on the record before this Court, Monroe cannot show a substantial likelihood that the prejudice affected the verdict. *Gamble* explains, "In the context of a given case it may be that improper evidence did not affect the outcome of the trial, and in such situations a trial court may deny a motion for a mistrial." 168 Wn.2d at 177. A denial of a motion for mistrial "should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." *Id.* Considering the context of the trial as a whole and compelling evidence of Monroe's guilt,[9] we conclude there was not a substantial likelihood that the prejudice, if any, affected the verdict.

---

[9] Some of the other evidence of Monroe's guilt includes Bertram's identification of Monroe in a photo array; Bertram's identification of Monroe in court; Monroe's possession of the bag and gun Bertram described stealing from his assailant the day he was shot; Bertram's knowledge of Monroe's estranged wife, her address, and Monroe's no-contact order relating to her as discussed in the hours leading up to the shooting; Bertram's knowledge of his assailant's court appearance on the day he was shot; and Bertram's knowledge of the unnamed woman in the car is consistent with Monroe's girlfriend's name and her workplace.

C.    Other Acts Evidence

Before trial, Monroe filed a motion in limine to exclude other acts evidence under ER 404(b).  At the hearing on the motion, the State indicated it sought to admit the gun found in Monroe's possession (which matched Bertram's description of the one he stole from his assailant) to establish identity.  The trial court admitted the evidence.  Monroe argues the trial court abused its discretion in so ruling because "[t]he gun was unfairly prejudicial and cumulative of other evidence for the purpose for which it was offered."  We disagree.[10]

Evidence of other crimes, wrongs, or acts is inadmissible to prove character and show action in conformity therewith.  ER 404(b).  Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, *identity*, or absence of mistake or accident." *Id.* (emphasis added).  Admissibility of other acts evidence under ER 404(b) requires a four-step analysis.  *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).  The fourth step, which is the focus of the parties' briefing and argument here, is to "weigh the probative value against the prejudicial effect." *Id.*[11] A ruling under ER 404(b) is reviewed for abuse of discretion, and appellate courts defer to those rulings unless "'no reasonable person would take the view adopted

----

[10] Although we agree with the State on this point, we reject its argument that Monroe's ER 404(b) objection was not adequately preserved in the trial court because he did not expressly cite ER 404(b).  Critical here, the admissibility of the gun was discussed in the context of Monroe's ER 404(b) motion, and the trial court understood the issue as such.  Additionally, our Supreme Court has held, "An objection based on 'prejudice,' is adequate to preserve an appeal, based on ER 404(b), because it suggests the defendant was prejudiced by the admission of evidence of prior bad acts." *State v. Mason*, 160 Wn.2d 910, 933, 162 P.3d 396 (2007).

[11] The other three steps, not at issue here, require the trial court to "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, [and] (3) determine whether the evidence is relevant to prove an element of the crime charged." *Id.*

by the trial court.'" *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Consistent with the above authorities, the trial court heard argument from both sides and analyzed the purpose, relevance, and probative value of the evidence, which included both the gun and the brown leather bag. The trial court concluded, "in a case where identity is so important, and it apparently is, then the similarity of these items to what the alleged victim described is highly relevant, highly probative, and substantially more probative than any prejudice. So I will permit that." The trial court thus recognized that the gun was highly relevant to show identity and any prejudice was substantially outweighed by its probative value. This careful analysis satisfies the ER 404(b) framework, including the fourth step at issue here.

Monroe argues this particular gun was inadmissible because it was not used to shoot Bertram, but case law imposes no such requirement. To the contrary, "Guns do not necessarily have to be used in the commission of a crime to be admissible." *State v. Hoffman*, 116 Wn.2d 51, 92, 804 P.2d 577 (1991). *State v. Hartzell*, 156 Wn. App. 918, 926, 237 P.3d 928 (2010), is instructive on this point. The defendants there were charged with assault while armed and unlawful possession of a firearm. The trial court admitted evidence connecting the guns used in the charged crimes to two unrelated gun incidents. *Id.* at 930. Similar to Monroe here, the defendants in *Hartzell* argued the admission of the evidence violated ER 404(b) because it was offered to show their propensity to commit gun crimes. *Id.* We disagreed, holding: "[T]he evidence was offered merely to show

that the weapons used [in the crime] were found shortly thereafter in the possession of [the defendants], thus tending to make it more probable that they were the individuals who did the shooting . . . ." *Id*. at 932. We therefore affirmed the trial court's ruling that "[t]he probative value of the evidence outweighed its prejudicial effect." *Id.*

As in *Hartzell*, the record establishes the gun at issue here was not admitted to show that Monroe had a general propensity to use guns or commit gun crimes. Instead, the evidence was admitted because it connected Monroe to the gun that Bertram took from Monroe a few hours before Monroe shot him. Connecting Monroe to the gun was relevant to prove that he was the assailant, which was a significant issue at trial. Because the trial court applied the correct legal standard, its analysis is not legally or factually untenable, and it cannot be said that no reasonable person would take the view adopted by the trial court, Monroe is unable to establish the court abused its discretion in admitting the gun to show identity.

D.     Prosecutorial Misconduct

Monroe argues reversal of his conviction is required because the prosecutor committed misconduct during closing arguments in two distinct ways: first, by "denigrat[ing]" defense counsel, and second, by "trivializing the [State's] burden of proof." We disagree with both arguments.

Significantly, Monroe failed to object at trial to either of the alleged instances of prosecutorial misconduct. Where, as here, the defendant did not object to the alleged instances of prosecutorial misconduct, the defendant must show on appeal that "the misconduct was so flagrant and ill-intentioned that (1) no curative

instruction would have obviated any prejudicial effect on the jury and (2) the resulting prejudice had a substantial likelihood of affecting the jury verdict." *State v. Mireles*, 16 Wn. App. 2d 641, 656, 482 P.3d 942 (2021). We review the prosecutor's conduct in the context of the whole argument, issues of the case, evidence addressed in the argument, and jury instructions. *State v. Gouley*, 19 Wn. App.2d 185, 200, 494 P.3d 458 (2021). Defense counsel's failure to move for a curative instruction or a mistrial for an allegedly improper remark "strongly suggests the argument did not appear [irreparably prejudicial] in the context of the trial." *State v. Negrete*, 72 Wn. App. 62, 67, 863 P.2d 137 (1993).

Starting with Monroe's first argument—that the prosecutor improperly denigrated defense counsel—the prosecutor initially discussed Bertram's credibility as a witness and noted that credibility is for the jury to determine. He next stated the jury must "evaluate what [Bertram] has been telling [them]" and that the testimony should be "filter[ed]" "through a lens of reasonableness." The State argued that Monroe and Bertram agreed on the series of events up to a certain point. They agreed they spent time together and that in the morning Monroe parked at the library near the courthouse and then, according to the State, their accounts diverged:

> It's kind of an axiom in criminal defense. It goes like this: Admit what you cannot deny and deny what you can't admit. And that's exactly what's going on here. And we haven't heard the defense argument yet, but the opening statement matches everything up to the library, because you can't deny it. And then, apparently, they part ways, under the defense suggestion, because he can't admit otherwise.

Instead of objecting, Monroe's counsel responded to the state's argument in their own closing that "[d]eny what you can't admit" is "not what happened here."

Monroe contends that the meaning of the prosecutor's statement is "clear" and that it refers to defense counsel "[c]onceding incontrovertible facts," which in turn "buys credibility, which the defense can cash in to deny every fact suggesting guilt." But the statement in context is tied directly to evidence before the jury. It "is not misconduct for the prosecutor to argue that evidence does not support the defense theory." *State v. Thorgerson*, 172 Wn.2d 438, 449, 258 P.3d 43 (2011) (citing *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994)). Furthermore, because Monroe did not object, even if the statement was improper, it was not so "flagrant and ill intentioned" that a curative instruction could not have obviated any prejudicial effect. We therefore reject this argument.

Turning to Monroe's second argument—that the prosecutor improperly trivialized the State's burden of proof—the prosecutor asserted in closing argument as follows:

> I just want to remind you that [reasonable doubt is] the standard. It's not beyond a shadow of a doubt. It's not beyond all doubt whatsoever. I'm not trying to say it's a low duty or shirk my duties. It's a high burden. It's the highest in the justice system, the legal system. But it isn't beyond all doubt whatsoever and some of those other phrases you hear. And as pointed out, the keyword in there was "reasonable."
>
> So to the extent that somebody suggests, well, we don't know that a UFO didn't come down and shoot, that's where that comes in, and those other examples about, you know, how far those two to four zippers go, five-nine to five-eight,[12] whatever, it's got to be reasonable despite any personal feelings about what that standard of proof is or ought to be. You have to follow the one the judge gave you, and you all agreed to do it.

---

[12] "Two to four zippers" and "five-eight to five-nine" refers to evidence presented at trial. Bertram testified that there were two zippers on the stolen bag but a photograph of the bag recovered from Monroe shows a total of four zippers. Bertram, who is 5'7", indicated his assailant was between two and four inches taller than himself. Monroe is 5'8".

Monroe claims the prosecutor thereby misstated the State's burden of proof.

Contrary to Monroe's argument, the prosecutor correctly stated that the burden of proof in a criminal case is beyond a reasonable doubt and that it is "the highest in the justice system." The prosecutor's statement is consistent with the court's unopposed instruction that, "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." Since the comment in the context of the whole argument, issues of the case, evidence addressed in the argument, and jury instructions was not improper, Monroe cannot show prosecutorial misconduct. But even if he could, the comment was not so flagrant or ill intentioned that a curative instruction could not have obviated any prejudicial effect. This argument thus fails.

E.    Cumulative Prejudice

Finally, Monroe argues cumulative prejudice from trial errors requires reversal. The cumulative error doctrine "requires reversal where a combination of . . . errors denies the defendant a fair trial." *State v. Ritchie*, 24 Wn. App. 2d 618, 644 n.9, 520 P.3d 1105 (2022). But "where the errors are few and have little or no effect on the outcome of the trial," reversal is not required. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 252 (2006). Because the alleged errors are at most few and had little or no effect on the outcome of trial, we conclude that Monroe is not entitled to relief under the cumulative error doctrine.

III

Monroe appeals his LWOP sentence under the POAA on two grounds: (1) the POAA is unconstitutionally cruel because it is administered in a racially-

biased manner, and (2) the trial court violated his right to a trial by jury because his sentence is predicated on an impermissible judicial finding that he was convicted "on at least two separate occasions" of most serious felonies and "at least one conviction . . . occurred before the commission of any of the other most serious offenses" under RCW 9.94A.030(37)(a)(ii). We disagree with both arguments.

Regarding the constitutionality of POAA, "The Eighth Amendment [to the United States Constitution] bars cruel and unusual punishment while article I, section 14 [to the Washington Constitution] bars cruel punishment." *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014). Although this Court has noted "we have serious concerns about the racially disproportionate impact of the POAA," we have not held that the statute is unconstitutional. *State v. Nelson*, 31 Wn. App. 2d 504, 517, 550 P.3d 529 (2024). Instead, our courts "have continually upheld sentences imposed under the POAA as constitutional and not cruel under article I, section 14" of the Washington Constitution. *State v. Moretti*, 193 Wn.2d 809, 820, 446 P.3d 609 (2019); *see also Witherspoon*, 180 Wn.2d at 889 (holding defendant's life sentence under the POAA was not cruel and unusual punishment).

Monroe likens his case to *State v. Gregory*, 192 Wn.2d 1, 23-24, 427 P.3d 621 (2018), which addressed the constitutionality of our state's death penalty. Addressing that issue, the court concluded that because the death penalty was disproportionately imposed in an arbitrary and racially-biased manner, the "capital punishment law lacks 'fundamental fairness' and thus violates article I, section 14" of the Washington constitution. 192 Wn.2d at 24. In contrast to our state's death

penalty, the POAA allows the trial court no discretion in sentencing an offender to LWOP. RCW 9.94A.570 ("[A] persistent offender *shall* be" sentenced to life in prison without the probability of parole (emphasis added)). Instead, the POAA is "administered the same way no matter who the defendant; *all* offenders who commit three most serious offenses will be sentenced to LWOP." *Nelson*, 31 Wn. App. 2d at 516–17. It therefore cannot be said that the POAA is administered in an arbitrary and racially biased manner in the same sense as the death penalty at issue in *Gregory*.

Monroe's case is distinguishable from *Gregory* in another respect. In *Gregory,* our Supreme Court admitted as evidence a study on the effect of race on the imposition of the death penalty and ordered its Commissioner to conduct additional fact-finding as part of its statutorily required review under RCW 10.95.100 (repealed by 2023 c 102 § 21). 192 Wn.2d at 12-13. The Commissioner subsequently issued formal findings. *Id.* at 13. Reviewing those findings, the Court held "Washington's death penalty [was] unconstitutional, as administered, because it [was] imposed in an arbitrary and racially biased manner." *Id.* at 35. Although Monroe cites and discusses a recently published study that purportedly supports the conclusion that the POAA disproportionally affects men of color,[13] the record does not include findings similar to *Gregory*, largely because the report Monroe cites was published after he was sentenced. Nor can this court conduct such a hearing itself, as "appellate courts are not fact-finders." *Dalton M, LLC v.*

---

[13] Civil Rights Clinic at Seattle University School of Law; Fred T. Korematsu Center for Law and Equality; Lee, Melissa; and Levin, Jessica, "Justice Is Not a Game: The Devastating Racial Inequity of Washington's Three Strikes Law" (2024). Fred T. Korematsu Center for Law and Equality. 125. https://digitalcommons.law.seattleu.edu/korematsu_center/125. (Last visited August 4, 2025.)

*N. Cascade Tr. Servs., Inc.*, 2 Wn.3d 36, 54, 534 P.3d 339 (2023) (quoting *Garcia v. Henley*, 190 Wn.2d 539, 544, 415 P.3d 241 (2018)). We are thus unable to reach a conclusion contrary to our Supreme Court's holding in *Moretti* that sentences imposed under the POAA are constitutional and not cruel under article I, section 14 of the Washington Constitution.

Next, Monroe alternatively argues, even if the POAA is constitutional, the resulting LWOP sentence violates his constitutional right to a trial because the predicate offenses were found by the trial court rather than a jury. Contrary to Monroe's argument, it is well-established precedent in Washington that "[a]ll that is required by the constitution and the [POAA] statute is a sentencing hearing where the trial judge decides by a preponderance of the evidence *whether the prior convictions exist*." *State v. Wheeler*, 145 Wn.2d 116, 121, 34 P.3d 799 (2001) (emphasis added). *State v. Smith*, 150 Wn.2d 135, 156, 75 P.3d 934 (2003), upheld the exception allowing judges to determine the fact of prior convictions under the POAA, holding "neither the sixth amendment to the United States Constitution nor article I, sections 21 and 22 of the Washington Constitution includes the right to a jury determination of prior convictions at sentencing" under the POAA. The court in *Witherspoon* again addressed this issue, concluding, "under the POAA, the State must prove previous convictions by a preponderance of the evidence and the defendant is not entitled to a jury determination on this issue." 180 Wn.2d at 894.

Reviewing evidence of Monroe's 1995 conviction for arson in the first degree and his 2012 conviction for promoting prostitution, the trial court found

Monroe had been convicted as an offender "on at least 2 separate occasions" of "most serious offense[s]" and that "at least 1" conviction occurred before the commission of the others. Pursuant to Washington precedent allowing a judge to find the fact of a prior conviction, this finding was not in error. The judicial fact-finding extended no further than the constitutionally permitted fact of prior convictions, and Monroe's right to a trial by jury was not violated.

Notwithstanding the above analysis, Monroe claims *Erlinger v. United States,* 602 U.S. 821, 838, 144 S. Ct. 1840, 1854, 219 L. Ed. 2d 451 (2024), controls and only the jury was permitted to find that his convictions occurred on separate occasions. Monroe's reliance on *Erlinger* is misplaced. *Erlinger* concerned separate burglary convictions resulting from events occurring over a short period of time. *Id*. at 827. The Court held Erligner was entitled to a jury finding on whether his offenses occurred as part of a single episode or occurred on occasions different from each other. *Id.* The fact of his prior convictions was not at issue. In addition, *Erlinger* limited its holding: "[w]hile recognizing Mr. Erlinger was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that." *Id.* at 835.[14] In addition, our Supreme Court has clarified the reach of *Erlinger* in Washington, noting *Erlinger's* holding "is limited to resolving ACCA's occasions inquiry and does not overrule our state's well-established precedent in *Wheeler.*" *State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803 (2024). *Erlinger* is inapplicable where, as

---

[14] *Erlinger* examined the Federal Armed Career Criminal Act, 18 U.S.C. § 924(e)(1) (ACCA), which required a finding that "the defendant has three prior convictions for violent felonies or serious drug offenses that were committed on occasions different from one another." 602 U.S. at 825.

here, a judge determines only the fact of prior convictions, not whether the offenses underlying them occurred on different occasions. Because *Erlinger* does not apply here and Washington precedent plainly allows a judge to determine the fact of prior convictions under the POAA, we find no constitutional error.

IV

Finding no reversible error, we affirm.

Feldman, J.

WE CONCUR:

Díaz, J.

Smith, J.